DAINGERFIELD ISLAND
PROTECTIVE SOCIETY,
et al., Plaintiffs,

v.

Bruce BABBITT, Secretary, U.S.
Department of Interior,[1] et
al., Defendants.

Civ. A. No. 86–2396.

United States District Court,
District of Columbia.

June 8, 1993.

---

1. Mr. Babbitt, the current Secretary of the Interior, has been substituted for his predecessor, Mr. Lujan, pursuant to Fed.Rule Civ.Proc. 25(d).

Ronald J. Wilson, Columbia, MO, for plaintiffs.

Mark Nagle, Asst. U.S. Atty., Washington, DC, for defendants.

Thomas F. Farrell, II, McGuire, Woods, Battle & Boothe, Alexandria, VA, for intervenors.

## MEMORANDUM OPINION

JOHN H. PRATT, Judge.

This case is currently before the Court on parties' cross motions for summary judgment. Since there is no genuine dispute as

to the facts material to the disposition of this case, summary judgment is appropriate. For the reasons set forth below, we grant defendants' motion for summary judgment.

Name plaintiff Daingerfield Island Protective Society is a corporation organized under the laws of the District of Columbia. It is a nonprofit corporation created to promote, protect and enhance the quality of the environment of Daingerfield Island, an area of approximately 107 acres located along the Potomac River in Alexandria, Virginia. Additional plaintiffs include residents of Virginia who utilize Daingerfield Island for recreation, and the George Washington Memorial Parkway ("Parkway") for transportation, as well as an additional nonprofit corporation, and an unincorporated citizens' association.

Defendant Bruce Babbitt is Secretary of the Department of the Interior. He is responsible for, among other things, management of the National Park Service ("NPS"). The remaining defendants are the National Capital Planning Commission, and officials of both the Department of the Interior and the National Park Service. Richmond, Fredricksburg and Potomac Railroad Co. ("RF & P") and Potomac Greens Associates Partnership are intervenor defendants in this action as of right, having demonstrated to the Court an interest in the property at issue.

Plaintiff seeks declaratory and injunctive relief as well as costs and attorneys fees.

### Background

The facts of this case were presented in detail in *Daingerfield Island Protective Society, et al. v. Hodel*, 710 F.Supp. 368 (D.D.C. 1989), so we will only summarize them here. In 1970, the Secretary of the Interior signed a Land Exchange Agreement ("Exchange Agreement") under which the National Park Service ("NPS") would receive title to Dyke Marsh,[2] approximately 28.8 acres of environmentally sensitive wetland on the Potomac River between Alexandria and Mount Vernon, Virginia. In exchange for Dyke Marsh, NPS granted developer Charles Fairchild & Co. ("Fairchild") an easement to build an interchange on the Parkway which would

connect the Parkway with property leased by Mr. Fairchild from intervenor RF & P on Daingerfield Island. That Daingerfield Island property sits along the Potomac River, just south of National Airport. Fairchild planned to build a large office, hotel, and residential complex to be named "Potomac Greens" on the leased Daingerfield Island property.

Fairchild waited until July 6, 1971 to sign the Exchange Agreement, at which time it transferred the deed to Dyke Marsh to the United States. The terms of the Exchange Agreement provided that prior to the commencement of construction, the interchange *design* had to be approved by NPS, the National Capital Planning Commission ("NCPC") and the Fine Arts Commission. The Agreement further specified essential features of the design, thus limiting the agencies' discretion. *See* Exchange Agreement in the Administrative Record ("Admin.Rec.") at Tab 22. The first construction plans for the interchange were submitted in 1975. Many disagreements between Fairchild and NPS ensued. A draft environmental assessment by the NPS recommended that access to the Parkway be denied. Admin.Rec. at Tab 55. Counsel for NPS, however, cautioned that Fairchild's right to Parkway access had vested in 1971, so that NPS could not refuse to grant access. *Id.* NPS then recommended repurchasing the access rights, but this recommendation was not adopted, most likely because funds were not available to do so. *Id.*

In May of 1978, plaintiff Daingerfield Island Protective Society sought to enjoin the Department of the Interior and NPS from approving any interchange design. This challenge was dismissed without prejudice as premature, since no design had yet been approved. *Daingerfield Island Protective Society v. Andrus*, 458 F.Supp. 961 (D.D.C. 1978). In April of 1981, NPS approved an interchange design, reserving its right to make changes when a more detailed proposal was made. The Commission of Fine Arts approved the design in April of 1983, as did NCPC later that year. NPS issued a deed for the easement in 1984. *See* Admin.Rec. at

---

2. Sometimes referred to as "Dych" or "Dyche" Marsh.

Tabs 115, 130, 153. The deed was issued to RF & P as successor to Fairchild, which had terminated its lease due to the delays in the approval process.

In 1986, RF & P entered into a joint venture and announced plans to develop a somewhat smaller Potomac Greens complex than Fairchild had originally proposed. Plaintiffs then commenced this action, which culminated in an amended complaint filed February 20, 1987 consisting of 32 pages containing 137 separate factual allegations and 15 separate prayers for relief. In this free-swinging and far-reaching complaint, plaintiffs allege that the Exchange Agreement violated numerous statutes.[3] Plaintiffs in addition allege that NPS' approval of the interchange design violated numerous statutes, including the National Environmental Policy Act of 1969 ("NEPA") (Count I); the Mount Vernon Highway Act and the Capper–Cramton Act (Count III); the National Park Service Organic Act (Count IV); the Administrative Procedure Act ("APA") (Count VI); the National Historic Preservation Act (Count IX); as well as Executive Order No. 11988 and Floodplain Management Guidelines found at 45 Fed.Reg. 35916 (May 28, 1980) (Count VIII).[4]

This case is not new to us. The procedural history begins with our decision of April 14, 1989, which dismissed plaintiffs' challenges to both the validity of the 1970 Exchange Agreement, and the approval of the interchange design by NPS in 1981.[5] After appeal by plaintiffs, the case returned to us on remand from the Court of Appeals, pursuant to its decision of November 30, 1990.[6] Intervenors petitioned the Supreme Court for review on the applicability of the laches doctrine, but *certiorari* was denied on October 7, 1991. *Richmond, Fredericksburg & Potomac Railroad Co. v. Daingerfield Island Protective Society,* —— U.S. ——, 112 S.Ct. 54, 116 L.Ed.2d 31 (1991).

On July 14, 1992, we entered a Memorandum Opinion which dismissed plaintiffs' remaining challenges to the Exchange Agreement as time barred pursuant to 28 U.S.C. § 2401(a).[7] In that opinion, we expressly reserved reaching plaintiffs' remaining claims regarding the approval of the interchange design pending a hearing. A hearing was held on the remaining claims before this Court on September 21, 1992, at which time we requested the parties rebrief the remaining issues. We now address plaintiffs' remaining challenges to the approval of the interchange design.

---

3. Plaintiffs allege in their Amended Complaint that the Exchange Agreement violated the National Environmental Policy Act of 1969 ("NEPA"), 42 U.S.C. § 4321 *et seq.* (Count I); the Land and Water Conservation Fund Act, 16 U.S.C. § 460*l*–22(b) (Count II); the Mount Vernon Memorial Highway Act, 45 Stat. 721, the Capper–Cramton Act, 46 Stat. 482 (Count III); the National Park Service Organic Act, 16 U.S.C. § 1 *et seq.* (Count IV); the National Capital Planning Act, 40 U.S.C. § 71 et seq. (Count V); the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 *et seq.* (Count VI); and the National Historic Preservation Act, 16 U.S.C. § 470 *et seq.* (Count IX). At the risk of being flippant, a cynic might describe plaintiffs as indulging in the "kimono approach" (covering everything but touching nothing).

4. See footnote 3 for the citations to these statutes.

5. *See Daingerfield Island Protective Society, et al. v. Hodel,* 710 F.Supp. 368 (D.D.C.1989), holding that (1) plaintiffs' claims regarding the Land Exchange Agreement of 1971 were dismissed on the ground of laches; and (2) plaintiffs' claims

regarding the approval by National Park Service of the interchange design were rendered moot by the Continuing Appropriations Act of 1987.

6. *See Daingerfield Island Protective Society, et al. v. Lujan,* 920 F.2d 32 (D.C.Cir.1990), in which the Court of Appeals summarily affirmed dismissal of plaintiffs' NEPA claim (Count I), but vacated, reversed, and remanded as to all other counts. In its opinion, the Court of Appeals held that the doctrine of laches did not bar challenge to the Exchange Agreement, and that closer, claim-specific analysis was required before plaintiffs' non-NEPA challenges to the interchange approval could be declared moot.

7. *See Daingerfield Island Protective Society, et al. v. Lujan,* 797 F.Supp. 25 (D.D.C.1992). In pertinent part, 28 U.S.C. § 2401(a) states that "every civil action commenced against the United States shall be barred unless the complaint is filed within six years after the right of action first accrues." This Court held that plaintiffs' right of action accrued on the date when the Exchange Agreement, by its terms, became effective, July 6, 1971. Plaintiffs' complaint was filed on August 27, 1986, well outside of the limitations period.

## Discussion

■ Pursuant to Fed.R.Civ.P. 56(c), a party is entitled to summary judgment upon a showing "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Each party has moved for summary judgment on the remaining issues in this case.[8] We seek to be clear that plaintiffs' remaining right of action is limited to the judicial review provision of the Administrative Procedure Act ("APA") 5 U.S.C. § 702.[9] The standard of review set forth in the APA is highly deferential. This Court must uphold an agency action unless we find that the agency's decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." See *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 414, 91 S.Ct. 814, 822, 28 L.Ed.2d 136 (1971) (citing 5 U.S.C. §§ 706(2)(A), (B), (C), (D) (1964 ed., Supp. V)); accord *Matson Navigation Co., Inc. v. Federal Maritime Comm'n*, 959 F.2d 1039, 1043 (D.C.Cir.1992). Our role in review is limited. We are not called upon to agree or disagree with NPS' actions. The APA forbids substituting a court's judgment for that of the agency, and requires us to affirm an agency action if a rational basis exists for the agency decision. *Ethyl Corp. v. Environmental Protection Agency*, 541 F.2d 1 (D.C.Cir.1976); *Natural Resources Defense Council, Inc. v. S.E.C.*, 606 F.2d 1031 (D.C.Cir.1979). Counts I, II and V have been previously dismissed and are no longer before us. We will treat plaintiffs' remaining claims one at a time, in the order in which they were brought.

### Plaintiffs' Count III: The Mount Vernon Memorial Highway Act ("MVMHA") and The Capper–Cramton Act

■ Plaintiffs allege that the NPS violated the letter and intent of the MVMHA and the Capper–Cramton Act when in 1981 it approved the interchange design. Plaintiffs claim that such an interchange would "disrupt the aesthetic and scenic quality of the Daingerfield Island stretch of the Parkway; dramatically increase the amount of traffic on the Parkway, thereby degrading the air and water quality and increasing noise levels; and will result directly in ... a visual intrusion on the scenic character of the Parkway." Plaintiffs' Amended Complaint at pp. 17–18.

The MVMHA was enacted on May 23, 1928. The Act authorizes and directs the construction of "a suitable memorial highway to connect Mount Vernon, the home and burial place of George Washington, in the State of Virginia, with the south end of the Arlington Memorial Bridge, ..."[10] The Act provides for the acquisition of land and appropriates funds through the fiscal year ending June 30, 1931.[11] The only reference the MVMHA makes to action beyond the construction of the Parkway, is that the Secretary of Agriculture shall cause the Parkway to be "properly maintained."[12]

The Capper–Cramton Act was enacted two years later on May 29, 1930. It expanded upon the MVMHA, providing "[f]or the ac-

---

8. The case has been well-papered on both sides. Plaintiffs filed a Motion for Partial Summary Judgment on January 28, 1992. Plaintiffs' Motion in effect became a motion for complete summary judgment after our July 14, 1992 Memorandum Opinion disposed of the sole genuine issue of material fact which plaintiffs had noted. Plaintiffs filed a renewed Motion for Summary Judgment on December 12, 1992. Defendants filed a Motion to Dismiss or in the Alternative for Summary Judgment on December 18, 1991, and a Supplemental Memorandum in Support of their Motion for Summary Judgment on December 21, 1992. Intervenor RF & P filed a Motion to Dismiss or in the Alternative for Summary Judgment on December 18, 1991, and a Supplemental Memorandum in Support of its Motion to Dismiss or for Summary Judgment on December 21, 1992.

9. *See* this Court's Memorandum Opinion of July 14, 1992, 797 F.Supp. at 29–30. There, we held in accordance with *Cort v. Ash*, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), *Chrysler Corp. v. Brown*, 441 U.S. 281, 317–19, 99 S.Ct. 1705, 1725–26, 60 L.Ed.2d 208 (1979), and their progeny, that although the statutes cited by plaintiffs do not expressly provide for a private right of action, plaintiffs are entitled to judicial review of agency action pursuant to the APA.

10. 45 Stat. 721 (1928).

11. *Id.*

12. *Id.*

quisition, establishment, and development of the George Washington Memorial Parkway ... and to provide for the acquisition of lands in the District of Columbia and the States of Maryland and Virginia requisite to the comprehensive park, parkway, and playground system of the National Capital."[13] The Act appropriates such funds "as required for the expeditious, economical, and efficient development and completion" of certain projects, including the Parkway.[14] Like the MVMHA, no reference is contained in the Capper–Cramton Act regarding governmental actions subsequent to the Parkway's completion. Furthermore, plaintiffs' argument that the Capper–Cramton Act applies to the approval of the interchange design by the NPS in 1981, already farfetched, loses all credibility in light of that portion of the Act which decrees that it shall apply to the Parkway, "to include the shores of the Potomac, and adjacent lands, from Mount Vernon to a point above the Great Falls on the Virginia side, *except within the city of Alexandria*," (emphasis added).[15] Since the proposed interchange design is located strictly within the city of Alexandria,[16] the Act, by its own express terms, does not apply to the proposed interchange.

It is clear from reading both the MVMHA and the Capper–Cramton Act that neither of these acts was intended to reach the specific conduct of which plaintiffs complain. It is clear that these Acts were intended to relate primarily to appropriations functions. The one reference to future maintenance found in the MVMHA is far too vague to allow for such specific enforcement as plaintiffs here request. The Capper–Cramton Act likewise fails to provide for future maintenance and planning, and, as noted above, expressly does not apply to Alexandria, VA, the site of the proposed interchange. Accordingly, we can not find that NPS approval of the interchange design violated either one of these statutes, assuming that either or both ap-

plied. Nor can we find that NPS' approval was somehow arbitrary, capricious, or an abuse of discretion in light of these statutes.

### Plaintiffs' Count IV: The National Park Service Organic Act

Plaintiffs allege that NPS' approval of the interchange design violated the National Park Service Organic Act ("Organic Act"), 16 U.S.C. § 1 *et seq.* The Organic Act establishes the National Park Service and directs it to:

> promote and regulate the use of Federal areas known as national parks, monuments, and reservations ... by such means and measures as conform to the fundamental purpose of said parks, monuments, and reservations, which purpose is to conserve the scenery and the natural and historic objects and the wild life therein and to provide for the enjoyment of the same in such manner and by such means as will leave them unimpaired for the enjoyment of future generations.

16 U.S.C. § 1. Unlike in the case of the MVMHA and the Capper–Cramton Act, we do not question the applicability of the Organic Act to NPS' actions regarding the proposed interchange. The Parkway is a part of the "national park system" as defined in the Organic Act.[17] It is clearly covered by the Organic Act and thus is within the administrative jurisdiction of the NPS.

The question before us is whether NPS' approval of the interchange design was a violation of the APA in light of the provisions of the Organic Act. Congress clearly intended the Secretary of the Interior ("Secretary") to have an affirmative duty "to take whatever actions and seek whatever relief as will safeguard the units of the National Park System." *Senate Report 95–528*, 95th Cong., 1st Sess., 9 (October 21, 1977). Congress did not, however, spell out any specific direction as to *how* this duty must be undertaken.[18]

13. 46 Stat. 482 (1930).

14. *Id.*

15. *Id.*

16. *See generally* the Environmental Assessment, Admin.Rec. at Tab 55.

17. *See* 16 U.S.C. § 1c.

18. *See Sierra Club v. Andrus,* 487 F.Supp. 443, 448 (D.D.C.1980), "Nowhere in either 16 U.S.C. §§ 1 or 1a–1 is there a specific direction as to how the protection of Park resources and their federal administration is to be effected. Certainly the Secretary is not restricted in the protection

Accordingly this court concluded in *Sierra Club v. Andrus,* 487 F.Supp. 443 (D.D.C. 1980), that the Secretary has broad, but not unlimited discretion in determining what actions are best calculated to protect Park resources.[19]

■ In order to determine whether NPS had a rational basis for its approval of the interchange design, it is most instructive to examine the extensive Administrative Record and the information available to the NPS at the time the approval decision was made by the Department of the Interior in April of 1981.[20] *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 419, 91 S.Ct. 814, 825, 28 L.Ed.2d 136 (1972). We may not properly consider the "evidence" of the negative effects predicted to flow from the proposed interchange taken by plaintiffs from an Environmental Impact Statement apparently published in February of 1991.[21]

It is not disputed that there is a judicial presumption favoring the validity of an administrative action. *See Duesing v. Udall,* 350 F.2d 748 (D.C.Cir.1965). The Administrative Record reveals that NPS spent more than seven years studying interchange design options and their projected impacts on the Parkway. Admin.Rec. Tabs 35–115. Multiple studies of the impact of the proposed interchange designs on both traffic flow and the surrounding environment were commissioned and examined. *See, for example,* Admin.Rec. at Tabs 45, 53, 55, 72. 76–78. Previous studies undertaken in relation to the Exchange Agreement were also considered. The NPS considered and rejected several designs proposed by Fairchild, in part for being "inadequate" and unduly interfering with recreational activities on Daingerfield Island, including biking, soccer and a marina. Admin.Rec. Tab 87. Plaintiffs do not dispute that the final diamond inter-

change design approved by NPS, which reserved the right to make subsequent modifications, is the most appropriate and least intrusive of all of the interchange designs proposed.

Plaintiffs seem to suggest that NPS' approval of *any* interchange design was arbitrary and capricious and an abuse of discretion in light of the information available. Indeed, there is evidence that NPS itself considered recommending that no interchange be approved or built and that the government explore repurchasing the easement rights it had traded to Fairchild in the 1970 Land Exchange Agreement.[22] However, NPS was firmly advised by counsel that the Exchange Agreement was legally binding. *See* Admin.Rec. at Tab 153. Thus the only choice left to NPS was to approve the least intrusive interchange possible, which it did, or to refuse to approve any interchange at all, which would have violated the Exchange Agreement that it had been informed was legally binding on the federal government.

■ Where several administrative solutions exist for a problem, courts will uphold any one with a rational basis, so long as the balancing of competing solutions is not an arbitrary one. *See Wilderness Public Rights Fund v. Kleppe,* 608 F.2d 1250, 1254, (9th Cir.1979) citing *Udall v. Washington, Virginia and Maryland Coach Co.,* 398 F.2d 765 (D.C.Cir.1968), *cert. denied,* 393 U.S. 1017, 89 S.Ct. 620, 21 L.Ed.2d 561 (1969). It is clear from the Administrative Record that NPS' approval of the diamond interchange design was not an arbitrary decision. The Administrative Record clearly demonstrates that NPS expended years of effort to select the least intrusive design alternative for the proposed interchange. Defendants plainly were

and administration of Park resources to any single means."

19. *Id.,* at 448–449. *See also Wilderness Public Rights Fund v. Kleppe,* 608 F.2d 1250, 1253 (9th Cir.1979) (The Secretary has "wide ranging" responsibility for managing national parks. Issuing use permits for the Colorado River to professional guide services is "well within the area of administrative discretion granted to the NPS.")

20. *See* Admin.Rec. at Tab 115.

21. *See* Plaintiff's Attachment B.

22. *See* Admin.Rec. at Tab 72, which shows NPS support in January of 1978 for the option of breaching the Exchange Agreement by not approving an interchange design and/or reacquiring the access rights from Fairchild.

acting within the scope of their statutory authority, and plaintiffs' claim must fail.

### Plaintiffs' Claim VI: Violations of the Administrative Procedure Act ("APA")

Plaintiffs allege that the approval of the interchange design constituted a "rule" as defined by the APA at 5 U.S.C. § 551. If the approval was a rule as plaintiffs allege, then the government was required to provide "interested persons" with notice and opportunity to comment as a part of the rulemaking process,[23] which the government clearly did not do. Plaintiffs further allege that whether or not the approval of the interchange design constituted a rulemaking, the government was required to publish in the *Federal Register* notice of the approval as an action that may affect members of the public, pursuant to 5 U.S.C. § 552. The government clearly did not publish such notice.

■■■ Defendants object that the approval of the interchange design was not a "rule" as defined in 5 U.S.C. § 551(4), and therefore the APA's notice and comment requirements do not apply. Defendants further argue that 5 U.S.C. § 552 does not apply to the actions at issue. We agree with defendants and find that NPS' approval of the interchange design was not a "rule" under the APA, and hence did not require compliance with that Act's notice and comment procedures.[24] We further find that defendants were not required to publish notice of the design approval in the Federal Register pursuant to 5 U.S.C. § 552. At the risk of being charged with "overkill," our reasoning is as follows:

First, the APA defines a "rule" as:

the whole or part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency and includes the approval or prescription for the future of rates, wages, corporate or financial structures or reorganizations thereof, prices, facilities, appliances, services, or allowances therefor or of valuations, costs, or accounting, or practices bearing on any of the foregoing.

5 U.S.C. § 551(4). Rulemaking is defined as "agency process for formulating, amending, or repealing a rule." *Id.* § 551(5). The APA identifies several necessary components of a rule: it must be of "general or particular applicability"; it must be of "future effect"; and it must be designed to "implement, interpret or prescribe law or policy". *See In re FTC Corporate Patterns Report Litigation,* 432 F.Supp. 291, 301 (D.D.C.1977). NPS' approval of the interchange design was clearly not designed to implement, interpret or prescribe law or policy. The approval was an isolated agency act, which in no way proposed to effect or govern subsequent agency acts or decisions. The approval has no future effect on any other party before the agency. This sort of isolated act is not what the Congress intended to subject to the APA's formal notice and comment process.

Plaintiffs' second claim under the APA alleges that defendants violated the public notice provisions of 5 U.S.C. § 552 by not publishing notice of their approval of the interchange design in the *Federal Register.* The types of agency information required to be published in the *Federal Register* are listed at 5 U.S.C. § 552(a)(1).[25] Although Plain-

---

**23.** *See* 5 U.S.C. § 553.

**24.** Intervenors Potomac Greens Associates Partnership, *et al.,* argue that even if this Court were to hold that NPS' approval of the interchange design was a "rule" under the APA, NPS was not required to comply with that Act's rulemaking procedures because 5 U.S.C. § 553(a)(2) expressly exempts "matter[s] relating to ... public property ... or contracts." See Intervenors' Memorandum in Support of Motion to Dismiss or for Summary Judgment at p. 36, citing *Duke City Lumber Co. v. Butz,* 382 F.Supp. 362, 373 (D.D.C. 1974), *aff'd in part,* 539 F.2d 220 (D.C.Cir.1976),

cert. denied, 429 U.S. 1039, 97 S.Ct. 737, 50 L.Ed.2d 751 (1977). Because we hold that NPS' approval of the interchange design was *not* a "rule" under the APA, we do not reach Intervenors' argument.

**25.** "(a) Each agency shall make available to the public information as follows:

(1) Each agency shall separately state and currently publish in the Federal Register for the guidance of the public—

(A) descriptions of its central and field organization and the established places at which,

tiffs' Amended Complaint fails to specify what part of § 552(a) was allegedly violated, we assume from the more specific reference found in Plaintiffs' Renewed Motion for Summary Judgment [26] and from our own reading of the statute that plaintiffs are specifically referring to § 552(a)(1)(D).[27]

Subsection (D) requires agencies to publish three things: "[s]ubstantive rules of general applicability"; "statements of general policy"; and "interpretations of general applicability." 5 U.S.C. § 552(a)(1)(D). The NPS' approval of the interchange design fits none of these three categories. It was neither generally applicable, nor did it effect general policy. Accordingly, we find that the NPS was under no obligation to publish notice of its approval of the interchange design under 5 U.S.C. § 552(a)(1)(D).

#### Plaintiffs' Claim VII: Violations of the National Capital Planning Act

■ Plaintiffs allege that defendants the National Capital Planning Commission ("the Commission") violated the National Capital Planning Act, 40 U.S.C. § 71a et seq., ("NCPA"), by approving plans for the interchange design which were not in accord with the Commission's comprehensive plan for development of the National Capital region, and argue accordingly that the Commission's approval should be disallowed as arbitrary, capricious and an abuse of discretion. Plaintiffs further argue that the Commission must reconsider the interchange design in light of the altered nature of the proposed develop-

ment project and in light of "the significant increase in estimated traffic flows on the Parkway" since approval was given in 1983. Plaintiffs' Amended Complaint at p. 23–24.

Plaintiffs appear to have misrepresented the scope of the Commission's review. Defendants cite the Exchange Agreement as the only source of the Commission's review authority. Under the Exchange Agreement the Commission's authority is limited to approval or disapproval of certain design elements of the interchange, and does not include approval or disapproval of the project as a whole. Defendants point to changes in the interchange design that were made in response to the Commission's comments, and argue that the Commission fulfilled its duties under the Exchange Agreement.

The Commission was created by statute in 1924, with its principal duties being:

"to (1) prepare, adopt, and amend a comprehensive plan for the Federal activities in the National Capital and make related recommendations to the appropriate developmental agencies; (2) serve as the central planning agency for the Federal Government within the National Capital region, and in such capacity to review their development programs in order to advise as to consistency with the comprehensive plan; and (3) be the representative of the Federal and District Governments for collaboration with the Regional Planning Council, . . . ".

40 U.S.C. § 71a(e).[28] The Commission first promulgated a comprehensive plan in 1983, the year in which it also approved the interchange design.

the employees (and in the case of an unformed service, the members) from whom, and the methods whereby, the public may obtain information, make submittals or requests, or obtain decisions;

(B) statements of the general course and method by which its functions are channeled and determined, including the nature and requirements of all formal and informal procedures available;

(C) rules of procedure, descriptions of forms available or the places at which forms may be obtained, and instructions as to the scope and contents of all papers, reports, or examinations;

(D) substantive rules of general applicability adopted as authorized by law, and statements

of general policy or interpretations of general applicability formulated and adopted by the agency; and

(E) each amendment, revision, or repeal of the foregoing.
5 U.S.C. § 552(a) (1977).

**26.** See Plaintiffs' Renewed Motion for Summary Judgment at p. 7.

**27.** See footnote 24.

**28.** See McMillan Park Committee v. National Capital Planning Commission, 968 F.2d 1283, 1285 (D.C.Cir.1992) for a more detailed description of the National Capital Planning Act, the Commission and the comprehensive plan.

The transcript of the debate that took place at the Commission's meeting at which the interchange design was ultimately approved shows that the majority of the Commission, the Commission's General Counsel, and the Solicitor of the Department of the Interior were of the opinion that the Commission's authority to review the interchange design was limited to that provided in the Exchange Agreement. *See* Exhibit K. The majority of the Commission clearly believed its customary statutory review authority pursuant to Section 5 of the NCPA, at 40 U.S.C. § 71d(a), did not apply, but that the terms of the Exchange Agreement did. *Id.* The Exchange Agreement provides: " . . . that all plans for construction of the bridge and related approaches, ramps, and connections are to be approved by the National Park Service, the National Capital Planning Commission, and the Fine Arts Commission, . . ." Exchange Agreement, Admin.Rec. at Tab 22. Both parties have interpreted this language to give the Commission veto power over the design, but not over the ultimate existence of the interchange itself.

Interestingly, the review provided for in the Exchange Agreement is in part *more* far-reaching than the review provided by statute. Under the review provision cited by plaintiffs, 40 U.S.C. § 71d(a), the Commission reviews a proposed project in its entirety—including whether or not it should be built at all—submits its findings to the agency and ultimately issues a final report. Under the statutory review provisions, the agency must consider the final report, but need not act accordingly.[29] By contrast, under the provisions of the Exchange Agreement the agency may not proceed with a design unless the Commission approves of it. So the Commission's power of review under Section 5 of NCPA although broader, is ultimately unenforceable against the will of the agency; on the other hand, the Exchange Agreement

review power is narrower—limited solely to the issue of design—but more potent in that it can compel agency compliance.

▮▮▮ The narrow issue before us is whether by conducting its review under the terms of the Exchange Agreement, instead of under the statutory review provisions of the NCPA, the Commission acted in a way that was arbitrary, capricious, or an abuse of law. Courts traditionally accord substantial deference to an agency's own interpretation of a statute that it is charged with implementing. *See Chevron U.S.A. v. National Resources Defense Council,* 467 U.S. 837, 844, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984); *Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965). We "may not substitute (our) own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency." *Chevron,* 467 U.S. at 844, 104 S.Ct. at 2782. We find that it was reasonable of the Commission to conduct its review under the terms of the Exchange Agreement. It was reasonable for the members of the Commission to rely upon both the judgment of their own General Counsel[30] and that of the Solicitor of the Department of the Interior. We further find that this reliance was not an abuse of law because while review authority is clearly provided for by the Exchange Agreement, it is questionable whether the interchange design was even within the Commission's statutory review jurisdiction under 40 U.S.C. § 71d(a) as plaintiffs claim.

▮▮▮ The NCPA requires each Federal and District of Columbia agency to advise and consult with the Commission prior to (1) the preparation of construction plans originated by such agency for proposed developments and projects, or (2) commitments for the acquisition of land paid for in whole or

---

**29.** Even under the Commission's customary review pursuant to Section 5 of the NCPA, however, the Commission does not possess ultimate veto power over a proposed project. Instead, after a period of mandatory consultation between the agency and the Commission, the Commission submits a final report. After considering the report, the agency may choose to adopt its recommendations or not, as long as its actions are "in accordance with its legal responsibilities and

authority." 40 U.S.C. § 71d(a). So even if the Commission had pursued a Section 5 statutory review of the design, and even if it had issued a final report recommending that the interchange not be built, the NPS could have gone ahead and built it anyway.

**30.** A Mr. Shear. *See* Exhibit K.

part from Federal or District funds.[31]  Because we previously held that plaintiffs' challenge to the Exchange Agreement, through which land was acquired, was time-barred,[32] we need not address the second of the above situations.  Regarding the preparation of construction plans *originated* by an agency, it is unclear that this provision would extend to cover the proposed interchange.  The interchange development may well be said to have originated with Fairchild, not the NPS.  Although the Federal Government gave the developer the right to an access, it was Fairchild who proposed to build an interchange.  The construction plans arguably *originated* with Fairchild.[33]  Therefore, the Commission's review of the interchange design pursuant to the provisions of the Exchange Agreement instead of 40 U.S.C. § 71 *et seq.* was not arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law.

*Plaintiffs' Claim VIII:  Violations of Executive Order 11988 and Floodplain Management Guidelines*

Plaintiffs allege that NPS violated Executive Order 11988 and NPS guidelines implementing that Executive Order (sometimes "EO")[34] when it approved the design of the traffic interchange.  EO 11988, entitled "Flood Plain Management," was issued on May 24, 1977 by President Carter.  The EO seeks "to avoid ... the long and short term adverse impacts associated with the occupancy and modification of floodplains and to avoid direct or indirect support of floodplain development wherever there is a practicable alternative."  Exe. Order No. 11988, 42 Fed. Reg. 26951 (1977), as amended by Exe. Order No. 12148, 44 Fed.Reg. 43,239 (1979).  EO 11988 prescribes certain steps to be taken by federal agencies before carrying out activities effecting floodplains.  *Id.*

    A threshold question for the Court is whether an agency's alleged violations of an Executive Order are judicially reviewable.  Executive Order 11988 does not expressly create a private cause of action.[35]  However, this Circuit has indicated that plaintiffs generally may seek judicial review of an executive order pursuant to the APA.  *See Hadnott v. Laird,* 463 F.2d 304, 309, n. 13 (D.C.Cir.1972), citing to *Service v. Dulles,* 354 U.S. 363, 77 S.Ct. 1152, 1 L.Ed.2d 1403 (1957).[36]  As we indicated in our Opinion of

---

31.  40 U.S.C. § 71d(a).

32.  *See Daingerfield Island Protective Society, et al., v. Manuel Lujan, Jr. et al.,* 797 F.Supp. 25 (D.D.C.1992).

33.  *See* Admin.Rec. at Tab 40, which shows that the preliminary drawings and proposals for the interchange came from Fairchild, which submitted them to the NPS as early as July of 1974 in order to solicit its advice.  *See also* Admin.Rec. at Tab 41, and generally at Tabs 45 through 115 to trace the aggressive progression of Fairchild's design proposals and subsequent NPS responses, modifications and delays.

34.  These guidelines can be found at 45 *Fed.Reg.* 35916 (May 28, 1980), and a revised version appears at 47 *Fed.Reg.* 36718 (August 23, 1982).

35.  This Circuit has ruled that executive orders without specific foundation in congressional action are not judicially enforceable in private civil suits.  *See Manhattan–Bronx Postal Union v. Gronouski,* 350 F.2d 451, 456–57 (D.C.Cir.1965), *cert. denied,* 382 U.S. 978, 86 S.Ct. 548, 15 L.Ed.2d 469 (1966).  *See also Women's Equity Action League v. Cavazos,* 906 F.2d 742, 750 (D.C.Cir.1990), citing with approval *Utley v. Varian Associates,* 811 F.2d 1279, 1285–86, n. 14 (9th Cir.1987), *cert. denied,* 484 U.S. 824, 108 S.Ct. 89, 98 L.Ed.2d 50 (1987) (finding no private enforcement right in EO 11246 where there was no indication of executive intent to provide a private judicial remedy.)

36.  Other courts are split on the enforceability of EO 11988 either privately or under the APA.  *See, for example, Watershed Associates Rescue v. Alexander,* 586 F.Supp. 978 (D.Neb.1982) (holding that EO 11988 is not judicially enforceable); *contra Sierra Club v. Hassell,* 503 F.Supp. 552, 564 (S.D.Ala.1980) (assuming but not expressly finding a private cause of action to enforce EO 11988 and EO 11990).  The prevailing trend on the issue of APA review of executive orders pursuant to NEPA seems to be in favor of granting such review.  *See, for example, National Wildlife Federation, et al. v. Adams,* 629 F.2d 587 (9th Cir.1980) (reviewing agency compliance with EO 11990 under the APA, 5 U.S.C. § 706(2)(A)); *City of Waltham v. U.S. Postal Service,* 786 F.Supp. 105, 130–132 (D.Mass.1992) (holding that although NEPA does not expressly authorize the executive to act in its furtherance, that such an authorization can be implied, so that EO 11988 provides proper legal standards for court review under the APA); and *No Oilport! v. Carter,* 520 F.Supp. 334, 368 (W.D.Wash.1981) (holding that

July 14, 1992,[37] we believe plaintiffs are entitled to APA review of their EO 11988 claim.

■ After reviewing NPS' actions under the APA's arbitrary and capricious standard, however, we conclude that there is ample evidence in the record to support defendants' contention that they did indeed sufficiently consider floodplain impact in their decisions regarding the interchange design. *See e.g.* the 1983 Environmental Assessment at Admin.Rec. Tab 148, ("Because the site of the interchange is in the 100 year floodplain designated by the City of Alexandria, all ramps to the proposed overpass would be structured spans rather than roadways on fill ... [t]he structural design alternative allows free flow of flood waters"); *see also* the correspondence at Admin.Rec. Tab 149, (documenting NPS' requirement that RF & P agree to set aside additional floodplain property to compensate for whatever amount of official floodplain must be covered with fill in order to build the interchange).

### Plaintiffs' Claim IX: Violations of the National Historic Preservation Act

■ Finally, plaintiffs allege that NPS violated Section 106 of the National Historic Preservation Act, specifically 16 U.S.C. § 470f, in the following respects: failure to take into account the adverse effects of the interchange on the Historic District of the City of Alexandria and on the Mount Vernon Memorial Highway; failure to give the Advisory Council on Historic Preservation ("Advisory Council") reasonable opportunity to comment on the interchange design; failure to make a finding as to whether the interchange design would have an adverse effect on the Historic District of Alexandria or on the Mount Vernon Memorial Highway; failure to notify the Advisory Council of NPS' actions regarding the proposed interchange; and failure to consult with the Advisory

Council regarding those actions.[38] Accordingly, plaintiffs again ask us to find pursuant to the APA that NPS' actions were arbitrary, capricious, an abuse of discretion, and not in accordance with the law.

The National Historic Preservation Act, as amended, together with Executive Order 11593, provides a broad framework for coordinating federal historic preservation activities. The Act allows the Advisory Council to comment on federal actions affecting properties included in or eligible for inclusion in the National Register of Historic Places. The relevant part of the Act provides as follows:

> The head of any Federal agency having direct or indirect jurisdiction over a proposed Federal or Federally assisted undertaking in any State and the head of any Federal department or independent agency having authority to license any undertaking shall, prior to the approval of the expenditure of any Federal funds on the undertaking or prior to the issuance of any license ... take into account the effect of the undertaking on any district, site, building, structure, or object that is included in or eligible for inclusion in the National Register. The head of any such Federal agency shall afford the Advisory Council on Historic Preservation ... a reasonable opportunity to comment with regard to such undertaking.

16 U.S.C. § 470f. The entire Parkway was listed in the National Register of Historic Places in 1981. The parties do not dispute that the proposed interchange would be built in part directly on property protected under the Act. Plaintiffs additionally assert that the interchange will have a drastically negative effect on the nearby Historic District of Alexandria, VA.

We find that apart from the issue of whether or not NPS was obliged to comply with 16 U.S.C. § 470f,[39] the agency did sub-

the issue of EO 11988 compliance was properly before the court under the APA, 5 U.S.C. § 702).

**37.** *Daingerfield Island Protective Society, et al., v. Lujan,* 797 F.Supp. 25 (D.D.C.1992).

**38.** Plaintiffs' Amended Complaint at p. 30.

**39.** Intervenors have questioned whether the interchange design is a federal or federally assisted undertaking, and hence whether NPS' actions regarding the interchange are subject to the Act at all. NPS clearly believed at the time that it was subject to the Act and accordingly consulted with the Advisory Council. Because we find that NPS *did* substantially satisfy the consultation re-

stantially comply with the statute. Plaintiffs' claim is again without merit. Defendants draw the Court's attention to a letter from Mr. Robert Stanton, then Regional Director of the National Park Service, National Capital Region, to Mr. Robert Garvey Jr., then Executive Director of the Advisory Council, in which NPS expressly seeks Advisory Council approval of the interchange design pursuant to the National Historic Preservation Act. The letter, dated August 29, 1983, consists of a two page detailed description of the interchange proposal and encloses a diagram of the bridge as well as a copy of a letter from the Virginia State Historic Preservation Officer apparently concurring in NPS' opinion that "the proposed bridge design will have no adverse effect on those qualities which make the ... Parkway eligible for the National Register of Historic Places." The letter is stamped with the word "CONCUR" by the Advisory Council along with the date of September 12, 1983. *See* Admin.Rec. at Tab 163. Clearly, then, NPS *did* consult with the Advisory Council pursuant to the NHPA, and clearly the Council *did* concur with NPS' finding of no adverse effect.

Plaintiffs admit that NPS did consult with the Advisory Council, but argue that "there were such serious inadequacies in NPS's submission that it did not conform to the Council's regulations, and the Council's concurrence is an empty formality." Plaintiffs' Motion for Partial Summary Judgment at p. 73. In light of the Advisory Council's regulations promulgated in response to the NHPA and Executive Order 11593,[40] two inadequacies in NPS' submission are alleged: first, that NPS did not identify all historic sites affected by the traffic interchange; and, second, that NPS failed to submit adequate documentation to the Advisory Council. We will address these objections together, because they flow from the same mistaken premise.

Plaintiffs argue that NPS' submission was legally inadequate because it only mentioned one historic site to be affected by the interchange design, the Parkway itself, while failing to also mention the nearby Historic District of the city of Alexandria, Virginia. Plaintiffs label this a serious omission because the interchange may result in traffic congestion in the Historic District, as well as local population growth. We quite agree with plaintiffs that the existence of an interchange will likely have the described effect on Alexandria's Historic District. Plaintiffs mistake, however, the scope of NPS' submission. As discussed previously, plaintiffs' challenges to the Exchange Agreement of 1970 which conveyed to Fairchild the right to an interchange onto the Parkway, have been dismissed as time-barred.[41] Plaintiffs may not here expand their remaining challenge to the design approval into a challenge to the provisions of the Exchange Agreement. In its letter of August 29, 1983, NPS sought the Advisory Council's concurrence on its finding of no adverse impact merely for the *design* of the proposed interchange, not for the underlying decision to allow an interchange to be built.[42] The entire record makes clear that near consensus existed among the agencies that the underlying decision to allow an interchange to be built had been made, for better or for worse, and was not subject to their control.

This narrow interpretation of the review sought by NPS is supported by the content of its submission, and this speaks to plaintiffs' second objection. Detailed information is included regarding the proposed physical appearance of the bridge, including a cut stone veneer finish for all abutments, recessed lighting for the roadway surface, and landscaping of the adjacent area "with ever-

---

quirements of the Act, we do not need to reach the somewhat complicated question of whether or not the interchange technically constitutes a federal or federally assisted undertaking. For greater analysis of the legal definition of "federal or federally assisted undertaking," *see Techworld Development v. D.C. Preservation League,* 648 F.Supp. 106, 118–120 (D.D.C.1986).

**40.** *See* 36 C.F.R. §§ 800.1–800.8.

**41.** *See Daingerfield Island Protective Society, et al., v. Lujan,* 797 F.Supp. 25 (D.D.C.1992).

**42.** "We are seeking approval for the design plan only. Construction of the bridge is not contemplated in the immediate future." NPS letter of August 29, 1993, Admin.Rec. at Tab 163.

green and flowering trees." [43] NPS concludes its submission by saying it "believes the proposed design to be in keeping with the aesthetic character of the parkway, and similar in design to the already existing bridges on the parkway. For these reasons, we believe that the proposed bridge design will have no adverse effect on those qualities which make the Mount Vernon Memorial Parkway eligible for the National Register of Historic Places." [44] NPS does not include information about environmental impact of increased traffic flow to the surrounding communities, nor does it reference historic sites that are not within viewing distance of the proposed bridge because the scope of the review it seeks is limited to that of the bridge's design. NPS' submission was sufficient to comply with this limited purpose.

Finally, it is clear from the Administrative Record as a whole that the public was fully aware of the development of the interchange project from the moment the Exchange Agreement was signed in 1970 up through the present. This same Administrative Record eloquently documents the careful consideration given to compliance with the applicable statutes. Based on this extensive record it is clear that the defendants' actions were neither arbitrary, capricious nor an abuse of law.

In keeping with the above opinion, summary judgment is hereby granted for the defendants, and this case is dismissed with prejudice. An order consistent with this opinion is entered this same day.

### ORDER

Pursuant to the Memorandum Opinion issued this same day by this Court in the above-captioned matter, it is hereby

ORDERED that Defendants' Motion for Summary Judgment is granted; and it is

ORDERED that Intervenors' Motion for Summary Judgment is granted; and it is

ORDERED that Plaintiffs' Motion for Summary Judgment is denied; and it is

43. *Id.*

FURTHER ORDERED that this matter is hereby dismissed with prejudice.