SOKAOGON CHIPPEWA COMMUNITY (MOLE LAKE BAND OF LAKE SUPERIOR CHIPPEWA); Lac Courte Oreille Band of Lake Superior Chippewa Indians of Wisconsin; and Red Cliff Band of Lake Superior Chippewa Indians of Wisconsin, Plaintiffs,

v.

Bruce C. BABBITT, Secretary, United States Department of the Interior; Michael J. Anderson, Deputy Assistant Secretary, United States Department of the Interior; John J. Duffy, Counselor to the Secretary, United States Department of the Interior; and George Skibine, Director, Indian Gaming Management Staff, United States Department of the Interior, Defendants.

No. 95–C–659–C.

United States District Court,
W.D. Wisconsin.

June 11, 1996.

---

**1168**

Kevin C. Potter, Brennan, Steil, Basting & MacDougall, S.C., Madison WI, for Sokaogon Chippewa Community, Mole Lake Band of Lake Superior, Lac Courte Oreilles Band of Lake Superior.

Robert H. Friebert, Friebert Finerty & St. John, S.C., Milwaukee WI, for Red Cliff Band of Lake Superior.

Mark A. Cameli, Assistant U.S. Attorney, Madison WI, for Bruce C. Babbitt, U.S. Dept. of Interior, Michael J. Anderson, John J. Duffy and George Skibine.

## OPINION AND ORDER

CRABB, District Judge.

Plaintiffs are three Chippewa Indian tribes that applied to the Department of the Interior in October 1993, asking the United States to acquire in trust a greyhound racing facility in Hudson, Wisconsin for conversion into an off-reservation casino. The department denied plaintiffs' application after nearly two years of deliberations at the local and national levels. Plaintiffs responded by filing this civil action challenging the department's decision, alleging that improper polit-ical pressure from high-level congressional and executive branch officials tainted the decisionmaking process and led to the rejection of their application. Plaintiffs contend that by denying their application for improper political purposes, defendants violated duties imposed on them to acquire property for Indian gaming under 25 U.S.C. § 465 (the Indian Reorganization Act of 1934), and 25 U.S.C. § 2719 (the Indian Gaming Regulatory Act). Because plaintiffs' suit challenges agency action, it is premised on the Administrative Procedure Act (APA), 5 U.S.C. §§ 701–706.

The case is before the court on defendants' motions 1) for a protective order; 2) to limit judicial review to the administrative record; and 3) to strike a portion of the administrative record. The motions for a protective order and to limit judicial review are intended to stave off plaintiffs' assertions that the court should not follow the usual rule of relying solely on the administrative record when reviewing an agency decision under the APA. Plaintiffs argue that the strong likelihood of improper political influence on the Department of the Interior makes the rule inapplicable in this case. They seek to conduct discovery to determine the extent of any inappropriate use of political leverage.

Also before the court are plaintiffs' motions for partial summary judgment on their third and seventh claims and defendants' cross motion for summary judgment on those same claims. (Plaintiffs' third claim rests on allegations that John Duffy, Counselor to the Secretary of the Interior, acted improperly in reopening the statutory consultation process under 25 U.S.C. § 2719 in connection with their application. In their seventh claim, plaintiffs assert that Michael Anderson, the Department of the Interior Deputy Assistant Secretary who denied their application, lacked the authority to do so.)

Finally, plaintiffs have asked the court to take judicial notice of certain State of Wisconsin Elections Board records and to strike a declaration and several affidavits filed by defendants.

I conclude that plaintiffs have not made a showing sufficient to justify further inquiry

beyond the administrative record. Although plaintiffs have shown that congressional and presidential contacts were made with the Department of the Interior, they have not shown that the contacts could be deemed improper. Defendants' motion for partial summary judgment will be granted on plaintiffs' third and seventh claims. John Duffy had the authority to entertain further comments from Indian tribes opposed to plaintiffs' application and did not violate the Indian Gaming Regulatory Act in doing so. Michael Anderson had the authority under Department of the Interior policies to make a decision on plaintiffs' application. Plaintiffs' motion to strike a declaration and several affidavits filed by defendants will be denied because defendants need those documents to respond to allegations that could not have been anticipated when the administrative record was compiled. Plaintiffs' request for judicial notice will be granted because defendants have not opposed the motion and the information is public knowledge. Defendants' motion to strike a portion of the administrative record will be granted because the pertinent document was not before the Department of the Interior at the time the department was considering plaintiffs' application.

On June 5, 1996, plaintiffs submitted a motion to take judicial notice of a May 22, 1996 memorandum and decision of the United States Department of the Interior and Assistant Secretary–Indian Affairs Ada Deer that pertains to the department's consideration of a request by the Mashantucket Pequot Indian Tribe of Connecticut to take certain land into trust pursuant to 25 U.S.C. § 465. This decision has no effect on the resolution of this case. The decision does not support plaintiffs' contention that the views of local elected officials are unimportant. Even if that were the case under 25 U.S.C. § 465, the case in front of this court involves both 25 U.S.C. §§ 465 and 2719. Section 2719 mentions specifically that the department should consult with appropriate state and local officials. Even if the May 22 decision shows that it is the practice of Assistant Secretary Deer to adopt the findings and recommendations of her professional staff regarding trust acquisitions, it does not

follow that she must accept those recommendations in all instances as plaintiffs argue. She retains decisional authority and can deviate from the decisions of her subordinates when she believes it necessary.

For the purpose of deciding the pending motions, I find from the parties' proposed findings of fact that the following facts are undisputed.

## UNDISPUTED FACTS

Plaintiffs Sokaogon Chippewa Community, Lac Courte Oreilles Band of Lake Superior Chippewa and Red Cliff Band of Lake Superior Chippewa are Indian tribes acknowledged by the United States, with reservations in Forest County, Sawyer County and Bayfield County, Wisconsin, respectively. Defendant Bruce C. Babbitt is Secretary of the United States Department of the Interior; defendant Michael J. Anderson is Deputy Assistant Secretary–Indian Affairs; defendant John J. Duffy is Counselor to the Secretary; and defendant George Skibine is Director, Indian Gaming Management Staff, of the Department of the Interior.

On October 12, 1993, plaintiffs submitted an application to the Minnesota Area Office of the Bureau of Indian Affairs of the Department of the Interior for approval of an off-reservation casino to be located in Hudson, Wisconsin at a site that is presently the St. Croix Meadows greyhound racing facility. A request to establish an off-reservation gaming facility must be approved by the Secretary of the Interior in accordance with the Indian Gaming Regulatory Act, which provides at 25 U.S.C. § 2719(b)(1)(A) that off-reservation gaming is permitted only if:

> [T]he secretary, after consultation with the Indian tribe and appropriate State and local officials, including officials of other nearby Indian tribes, determines that a gaming establishment on newly acquired lands would be in the best interest of the Indian tribe and its members, and would not be detrimental to the surrounding community, but only if the Governor of the State where such gaming activity is to be conducted concurs in the secretary's determination; . . . .

Even if the secretary finds that the proposed off-reservation gaming establishment is in the best interest of the applicant tribes and would not be detrimental to the surrounding community and the governor concurs in that determination, the secretary must decide whether to exercise his discretion to acquire the land in trust pursuant to the Indian Reorganization Act, 25 U.S.C. § 465.

The Secretary of the Interior has delegated decisional authority to the Assistant Secretary–Indian Affairs for applications concerning off-reservation gaming. In turn, the Assistant Secretary–Indian Affairs has delegated responsibility for initiating the consultations required by § 2719(b)(1)(A) and for receiving, analyzing and making recommendations on gaming applications, while retaining final decisional authority.

In a March 24, 1994, reply to a letter dated January 10, 1994 from Myron Ellis of the Minnesota Indian Gaming Association, expressing his organization's opposition to plaintiffs' application, Assistant Secretary–Indian Affairs Ada Deer stated that the Minnesota Area Office had "initiated the Section 20 consultation required" by § 2719, advised Ellis that the Minnesota Area Office was reviewing plaintiffs' application and explained that the area office proceedings were "the only opportunity for the tribes to express their views and objections to the proposed trust acquisition." Pursuant to § 2719, the Minnesota Area Director of the Bureau of Indian Affairs of the Department of the Interior attempted to gauge the impact of plaintiffs' proposed casino on the surrounding community by sending out consultation letters soliciting comments on plaintiffs' proposed application. The Minnesota Indian Gaming Commission and all the Minnesota Indian tribes submitting comments expressed strong opposition to plaintiffs' plan. Most of the Wisconsin tribes that presented comments opposed the plan as well, particularly the St. Croix Chippewa Indians of Wisconsin, who argued that a gaming establishment in Hudson would harm their casino in Turtle Lake, Wisconsin, 50 miles from Hudson. The town of Troy, adjoining the city of Hudson, expressed concerns about increased traffic, light pollution, the influx of low-wage employees, the limited availability of affordable housing for the new employees and the lack of funding sources for treatment of compulsive gamblers. The city of Hudson believed that it could handle the casino and submitted results of a city referendum supporting the proposed casino by a 52–48% margin. St. Croix County concluded that the proposed casino would be detrimental to the surrounding community unless plaintiffs negotiated an agreement for government services. United States Senator Paul Wellstone of Minnesota and United States Congressman Steve Gunderson of Wisconsin expressed concern about the impact of the casino on the surrounding community.

On November 24, 1994, the Minnesota Area Office issued its recommendation that the United States acquire the proposed trust property because "it is in the best interest of the Tribes and its members and would not be detrimental to the surrounding community." The report was forwarded to the Indian Gaming Management Staff of the Bureau of Indian Affairs of the Department of the Interior in Washington, D.C.

In a letter dated December 29, 1994, the town of Troy sent Secretary Babbitt the results of a December 12, 1994 town referendum, in which 71% of the voters opposed the addition of plaintiffs' proposed casino in Hudson.

On January 11, 1995, Senator Wellstone and seven Minnesota congressmen wrote Secretary Babbitt, requesting that the secretary or John Duffy, Counselor to the Secretary, meet with representatives of Minnesota tribes opposed to plaintiffs' application.

In early February 1995, the Indian Gaming Management Staff completed its draft report on plaintiffs' application, concluding that the proposed casino would not have detrimental effects on the surrounding community but expressing the opinion that plaintiffs would need to provide more support to mitigate the effects of problem gambling. In a letter dated February 7, 1995, the city of Hudson informed Secretary Babbitt of a February 6, 1995 city resolution opposing plaintiffs' proposed venture.

On February 8, 1995, John Duffy and George Skibine, Director, Indian Gaming Management Staff, met with Senator Wellstone, four Minnesota congressmen and their staffs, the chairman of the Minnesota Indian Gaming Commission and leaders and lobbyists of the Mille Lacs, Boise Forte, Leech Lake, Mdewakanton, Red Lake and St. Croix tribes. Duffy agreed to allow these tribes additional time to submit comments and information in opposition to plaintiffs' application. Duffy did not inform plaintiffs of either the February 8 meeting or his decision to allow time for additional comments to be submitted until he sent plaintiffs a letter dated March 27, 1995, in which he explained that the tribes with which he met had been given until April 30, 1995 to submit additional information. In a letter dated March 30, 1995, plaintiffs wrote Secretary Babbitt, expressing concern over Duffy's decision to allow additional comments to be submitted.

On April 28, 1995, Indian tribes opposed to plaintiffs' application met with Donald Fowler, Chairman of the Democratic National Committee, and staff from the White House and the offices of Senators John Kerry, Tom Daschle and Paul Wellstone. On May 8, 1995, Ada Deer, Assistant Secretary–Indian Affairs, replied to plaintiffs' letter of March 30 to Secretary Babbitt, stating that she believed the Department of the Interior had acted within its discretion in agreeing to accept additional comments about plaintiffs' application.

In a letter dated May 8, 1995, Patrick O'Connor wrote to Harold Ickes, White House Deputy Chief of Staff for Policy and Political Affairs, urging Ickes to oppose plaintiffs' application, explaining the political ramifications of the decision and asking for a meeting with him. O'Connor explained that plaintiffs' proposal was supported by Tommy Thompson, Republican Governor of Wisconsin, and Alphonse D'Amato, Republican Senator of New York (supposedly D'Amato supported the plan because it would assist a New York company owning the defunct dog track), that plaintiffs' chairman is active in Republican party politics and that the representatives of the tribes opposing the project are Democrats that have offered financial support to the Democratic party. On May 17, 1995, leaders of the plaintiff tribes; Fred Havenick, President of Galaxy Gaming and Racing Limited Partnership, the owner of St. Croix Meadows; Paul Eckstein, a lawyer; and former Wisconsin Congressman Jim Moody met with John Duffy. Duffy said that approval for plaintiffs' application was not a "slam dunk" but did not elaborate further.

On June 8, 1995, the Indian Gaming Management Staff completed a draft report to its director, George Skibine, including the additional comments received during the February 8 to April 30, 1995 time period and the staff conclusion that the proposed casino would not be detrimental to the surrounding community and other Indian tribes. The staff acknowledged that neighboring tribes were opposed to plaintiffs' application because approval would mean increased competition for their casinos, but concluded that fear of competition is not valid evidence of a detrimental effect on the surrounding community.

In a letter to Harold Ickes, White House Deputy Chief of Staff, dated June 12, 1995, Senator Wellstone and six Minnesota congressmen opposed plaintiffs' application and asked Ickes to convey their concerns to Secretary Babbitt. On June 26, 1995, Jennifer O'Connor of the White House Office of Political Affairs faxed to Heather Sibbison in the Office of the Secretary of the Interior a copy of the June 12 letter from Senator Wellstone and the Minnesota congressmen. O'Connor asked Sibbison to have someone draft a response to that letter. On June 27, 1995, Sibbison sent a memorandum to O'Connor along with drafts of two letters to Senator Wellstone for Harold Ickes's signature: one letter indicated that the Department of the Interior had decided not to take the St. Croix Meadows facility into trust for gaming purposes and the other stated that the department was reviewing the application with "great care."

On or before June 29, 1995, George Skibine prepared a letter for the signature of Ada Deer, Assistant Secretary–Indian Affairs, advising that the Department of the Interior had decided not to acquire the St. Croix Meadows facility in trust and explain-

**1172**

ing its reasons for reaching that decision. For reasons left unexplained in the administrative record, neither Deer nor anyone else ever signed this letter. In an affidavit filed with the court, Deer explains that she recused herself from this matter because she had contributed to the state senatorial campaign of one of plaintiffs' leaders and that she understood that Michael J. Anderson, Deputy Assistant Secretary–Indian Affairs, would act in her stead.

On the morning of July 14, 1995, Paul Eckstein and Jim Moody met with John Duffy on behalf of plaintiffs to discuss the status of plaintiffs' application. Near the end of the meeting, Duffy stated that the application was being denied and the decision would be released that afternoon. Later that day, Eckstein met with Secretary Babbitt, requesting that the secretary delay the issuance of the decision until the following Monday to allow plaintiffs to respond to the political pressure being exerted against the application. Babbitt said he could not delay the release because Harold Ickes had told Babbitt the decision had to be issued that day.

In a letter dated July 14, 1995, Michael J. Anderson, Deputy Assistant Secretary–Indian Affairs, informed plaintiffs that the Department of the Interior had denied their application. Explaining the denial, Anderson cited the strong opposition of surrounding communities, elected state officials, and neighboring Indian tribes. Specifically, Anderson noted the detrimental impact on the St. Croix Tribe of Wisconsin, which would suffer a loss of market share and revenues if plaintiffs were allowed to construct a casino. In addition, Anderson explained that the department had received numerous complaints about the potentially harmful impact of a casino located one-half mile from the St. Croix National Scenic Riverway. Anderson stated that even if these factors were insufficient to support a determination under the Indian Gaming Regulatory Act, the Secretary of the Interior would rely on these same factors to decline to exercise his discretionary authority to take land into trust pursuant to the Indian Reorganiza-tion Act. Anderson made clear that his decision was "final for the Department."

The administrative record does not show a delegation of decisional authority on this matter to Deputy Assistant Secretary Anderson from either Secretary Babbitt or Assistant Secretary Deer.

OPINION

■ Under the Administrative Procedure Act, 5 U.S.C. §§ 701–706, courts have the power to review certain actions taken by federal administrative agencies. Generally, judicial review of an agency's decision is limited to the administrative record prepared in connection with that decision. 5 U.S.C. § 706; *Florida Power & Light Co. v. Lorion,* 470 U.S. 729, 743–44, 105 S.Ct. 1598, 1606–07, 84 L.Ed.2d 643 (1985); *Camp v. Pitts,* 411 U.S. 138, 142, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973); *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 420, 91 S.Ct. 814, 825–26, 28 L.Ed.2d 136 (1971). Courts are precluded from considering evidence that the agency never had a chance to review and from creating an evidentiary record different from that before the agency. *Stauber v. Shalala,* 895 F.Supp. 1178, 1189 (W.D.Wis.1995) (citing *Camp,* 411 U.S. at 142, 93 S.Ct. at 1244; *Edwards v. United States Dept. of Justice,* 43 F.3d 312, 314 (7th Cir.1994); *Cronin v. United States Dept. of Agriculture,* 919 F.2d 439, 443–44 (7th Cir. 1990)). Accordingly, in all but exceptional cases, discovery in cases brought under the APA is limited to materials contained in the administrative record. *Community for Creative Non–Violence v. Lujan,* 908 F.2d 992, 998 (D.C.Cir.1990); *Coalition on Sensible Transportation, Inc. v. Dole,* 826 F.2d 60, 72 (D.C.Cir.1987).

■ Nonetheless, it is well-established that courts can look beyond the administrative record when (1) evidence suggests bad faith or improprieties may have influenced the decisionmaker; (2) it appears that the agency has relied on substantial records and materials not included in the record; or (3) the procedures utilized and factors considered by the decisionmaker require further explanation for effective review. *Overton Park,* 401 U.S. at 420, 91 S.Ct. at 825–26;

*Public Power Council v. Johnson*, 674 F.2d 791, 793–95 (9th Cir.1982). However, a party must make a "strong showing" that one of these exceptions applies before a court will allow extra-record inquiry. *See Overton Park*, 401 U.S. at 420, 91 S.Ct. at 825–26; *Town of Norfolk v. United States Army Corps of Engineers*, 968 F.2d 1438, 1458–59 (1st Cir.1992). Defendants' motions for a protective order and to limit judicial review turn on whether these exceptions apply to this case. The extensive arguments marshaled by plaintiffs and defendants with respect to these motions are based on two very different conceptions of the Department of the Interior's decision to deny plaintiffs' application. Plaintiffs weave a tale of political intrigue and conspiracy, taking the view that but for improper political influence the Department of the Interior would have approved their application. Defendants dismiss the influence of insider politics and maintain that the Department of the Interior denied plaintiffs' application simply because plaintiffs failed to meet the statutory guidelines for taking property into trust. Given the parties' divergent views, it is difficult to determine where reality lies. At this point it is not necessary to determine the truth of the matter but only to decide whether the undisputed facts provide enough evidence of potential political impropriety to warrant extrarecord discovery and judicial review. In addressing this complex question, the first step is to survey the law concerning political pressure on agency actions.

## I. POLITICAL PRESSURE ON AGENCY DECISIONMAKING

■ In our federal system of representative democracy, congressional representatives are expected to represent the concerns of their constituents vigorously. This expectation of spirited congressional advocacy applies not only to legislation but to any governmental decision that affects constituent interests. If constituents make their representatives aware that an agency decision will affect their interests, they can anticipate, at least in theory, that the representatives will convey their concerns to the agency at an appropriate time. *See Sierra Club v. Costle*, 657 F.2d 298, 397 (D.C.Cir.1981) (in agency proceeding of vital concern to industry, environmental groups, Congress and administration, natural for all sides to stay in touch with agency until final rule promulgated). Legislative attention to agency decisions is not only permissible but desirable, given that agencies do not have direct political accountability. *Peter Kiewit Sons' Co. v. United States Army Corps of Engineers*, 714 F.2d 163, 170–71 (D.C.Cir.1983) ("Congressional oversight serves as a vital control on the quality and propriety of low visibility executive decisionmaking."); *Sierra Club*, 657 F.2d at 400 ("[V]ery legitimacy of general policymaking performed by unelected administrators depends in no small part upon the openness, accessibility and amenability of these officials to the needs and ideas of the public from whom their ultimate authority derives . . .").

■ Like congressional oversight, presidential oversight of agency decisionmaking is permissible and desirable. The President's power to appoint the Secretary of the Interior and remove him at will ensures that the department will give careful consideration to all presidential requests. Indeed, one could view presidential pressure as a wholly unremarkable concomitance of the placement of administrative agencies in the executive branch of government, except that doing so would ignore the fact that Congress delegates important legislative and adjudicative powers to executive branch agencies with the expectation that the decisions will not be dictated solely by presidential political whims. *See Humphrey's Executor v. United States*, 295 U.S. 602, 629, 55 S.Ct. 869, 874, 79 L.Ed. 1611 (1935) ("[T]he authority of Congress, in creating quasi-legislative or quasi-judicial agencies, to require them to act in discharge of their duties independently of executive control cannot well be doubted.").

■ Although congressional and presidential oversight of agency decisionmaking is an important part of our political system, at some point overzealous participation becomes detrimental to the agency's ability to act independently of political concerns. The trick is determining where the dividing line should be drawn between permissible over-

sight and improper contact. Some congressional or presidential staff pressure on agency decisionmakers is plainly impermissible and can invalidate an agency's administrative decision. *Portland Audubon Soc'y v. Endangered Species Committee*, 984 F.2d 1534, 1543–48 (9th Cir.1993) (presidential pressure); *Sierra Club*, 657 F.2d at 408–10 (congressional pressure); *District of Columbia Fed'n of Civic Ass'ns v. Volpe*, 459 F.2d 1231, 1246 (D.C.Cir.1971), *cert. denied*, 405 U.S. 1030, 92 S.Ct. 1290, 31 L.Ed.2d 489 (1972) (same); *Pillsbury Co. v. Federal Trade Comm'n*, 354 F.2d 952, 964 (5th Cir.1966) (same). For example, members of Congress cannot hold agencies hostage by conditioning money for an agency program on the agency's acquiescence to congressional desires with respect to a specific agency decision. *See District of Columbia Fed'n*, 459 F.2d at 1245–49 (Secretary of Transportation's decision to approve bridge project invalid if based in whole or part on threat from congressman that he would attempt to withhold funds from agency unless agency supported bridge project). Once the American electorate expresses its collective desire in the form of a federal statute delegating specified powers to an agency, democratic principles would be subverted by allowing a single congressional representative to compel the agency to make its decision on factors other than those set forth explicitly in the statute. Similarly, political accountability is not furthered by allowing the President to influence administrative proceedings through behind-the-scenes lobbying for a political decision. *Portland Audubon*, 984 F.2d at 1546.

■ Although it is difficult to determine a specific point at which congressional or presidential contact with agency decisionmakers becomes impermissible, in large part, the propriety of the contact depends on the nature of the administrative proceeding. There are two basic types of agency actions: rulemaking (quasi-legislative) and adjudication (quasi-adjudicative). *See* 1 Kenneth C. Davis & Richard J. Pierce, Jr., *Administrative Law Treatise* §§ 6.1, 8.1 (3d ed. 1994). The distinctions between the two can be murky; however, in general, rulemaking comprises the formulation of policies of widespread application while adjudication covers the resolution of disputes between specific parties.

■ Courts reviewing *quasi-adjudicative* agency decisions for evidence of congressional and presidential pressure have condemned ex parte contact and involvement by Congress and the President. *See Portland Audubon*, 984 F.2d 1534 (president and his staff cannot interfere with decisions of Endangered Species Committee); *Koniag, Inc., Village of Uyak v. Andrus*, 580 F.2d 601, 610 (D.C.Cir.), *cert. denied*, 439 U.S. 1052, 99 S.Ct. 733, 58 L.Ed.2d 712 (1978) (Secretary of Interior's appearance of impartiality compromised by letter he received from important congressman two days before issuing a decision on eligibility of certain Alaskan tribes to take land and revenues under the Alaska Native Claims Settlement Act); *Pillsbury Co.*, 354 F.2d at 964 (decision by Federal Trade Commission remanded to that agency because Congress subjected agency decisionmaker to investigation focusing directly and substantially upon decisional processes of agency while matter pending before agency); *but see ATX, Inc. v. United States Dept. of Transp.*, 41 F.3d 1522 (D.C.Cir.1994) (no reason to infer that letters from members of Congress to Secretary of Transportation affected his decision when reasons for decision fully supported in record); *Peter Kiewit Sons' Co.*, 714 F.2d 163 (reaffirming principles of *District of Columbia Fed'n* and *Pillsbury Co.*, but finding nothing in record to support finding of actual or apparent congressional interference). Behind these decisions is the idea that even an appearance of bias is improper in a quasi-judicial proceeding in which the decisionmaker is supposed to be impartial. *See Pillsbury Co.*, 354 F.2d at 964 (appearance of impartiality is the "sine qua non" of American justice). In keeping with this principle, judicial evaluation of any alleged pressure in quasi-adjudicative proceedings should focus on the "nexus" between the pressure and the actual decisionmaker. *ATX, Inc.*, 41 F.3d at 1527. *See also Peter Kiewit Sons' Co.*, 714 F.2d at 169–70 (proper focus not on congressional communications in abstract, but on relation between communications and adjudicator's decisionmaking process).

Courts examining *quasi-legislative* agency decisions have rejected the appearance of bias standard, recognizing that not all congressional or presidential contact with the agency taints the agency decision. *DCP Farms v. Yeutter,* 957 F.2d 1183, 1187 (5th Cir.), *cert. denied,* 506 U.S. 953, 113 S.Ct. 406, 121 L.Ed.2d 331 (1992) (applying appearance of bias standard would erect barrier to congressional oversight and dramatically restrict communications between Congress and agencies over policy issues); *Sierra Club,* 657 F.2d at 400 (in informal agency policymaking, concept of ex parte contacts is of questionable utility); *District of Columbia Fed'n,* 459 F.2d at 1246 (finding *Pillsbury Co.,* 354 F.2d 952, "inapposite" when agency action is not judicial or quasi-judicial). Communications between Congress and agencies help to guarantee the political accountability of unelected agency decisionmakers. *See Sierra Club,* 657 F.2d at 400–01.

■ The difficulty in this case is that the Department of the Interior's consideration of plaintiffs' application under 25 U.S.C. § 465 and 2719(b)(1)(A) does not fall neatly into either the rulemaking or adjudication categories. The department was neither considering the adoption of a rule of prospective application nor conducting a formal adjudication with a hearing in front of an administrative law judge. This is not a case like *ATX, Inc.,* 41 F.3d 1522, in which the agency's own regulations had characterized its proceedings as quasi-judicial, *id.* at 1527, or like *Portland Audubon,* 984 F.2d 1534, in which the legislative history of the statute at issue provided that the administrative decision was to be based on a formal adjudicatory hearing, *id.* at 1541.

Professors Davis and Pierce suggest that rulemaking and adjudication can be distinguished best on the type of facts analyzed, but this otherwise useful suggestion is of little help in this particular inquiry. *See* Davis & Pierce, *supra,* § 10.5 (adjudicative facts are usually specific because they are about particular parties while legislative facts are general propositions used to help a tribunal determine policy or declare law). Section 2719(b)(1)(A) instructs the secretary to consider whether acquiring the lands "would be in the best interest of the Indian tribe and its members" and whether such acquisition would be "detrimental to the surrounding community." These facts concern plaintiffs and the communities surrounding the proposed casino only and are not the type of broad facts agencies gather in connection with the development of quasi-legislative rules of widespread application. *See Daingerfield Island Protective Soc'y v. Babbitt,* 823 F.Supp. 950, 957 (D.D.C.1993), *aff'd,* 40 F.3d 442 (D.C.Cir.1994) (National Park Service's approval of highway interchange design is isolated act not intended to affect or govern subsequent agency decisions). On the other hand, the facts that the secretary must gather under § 2719 are not the type of facts at issue in most adjudicative hearings. Many of the facts are predictive, rather than historical, and come from non-parties, although they are parties with an interest in the outcome of the proceeding.

In any case, it is not clear that labeling the Department of the Interior's §§ 2719 and 465 decisionmaking process adjudicative instead of legislative provides much assistance in resolving this case. *See District of Columbia Fed'n,* 459 F.2d at 1247 (analysis of Secretary of Transportation's decision to approve bridge project after congressman's threat that he would attempt to withhold funds from agency unless project were approved cannot be illuminated by simplistic effort to force secretary's decision into a purely judicial or purely legislative mold). Defendants suggest that the court jettison any formal or informal, legislative or adjudicative distinctions because they are not helpful in determining the propriety of agency contacts with congressional and presidential staff members. They contend that 25 U.S.C. §§ 2719 and 465 grant the Department of the Interior "exceptionally unfettered" decisionmaking authority with respect to taking lands into trust for Indians, noting that Congress imposed no hearing or procedural requirements in either statute. *See Florida Dept. of Business Regulation v. United States Dept. of the Interior,* 768 F.2d 1248, 1256–57 (11th Cir.1985), *cert. denied,* 475 U.S. 1011, 106 S.Ct. 1186, 89 L.Ed.2d 302 (1986) (decision to acquire land in trust pursuant to 25 U.S.C. § 465 is committed to Secretary's discretion and is not

subject to judicial review). According to defendants, because their discretion is so broad, they must be receptive to a wide range of views and information regarding a proposed application, including the views of members of Congress and the President.

I agree with defendants that this case does not fit into either the adjudicative or legislative category. The important principle in the quasi-adjudicative case law is that agency adjudicators must avoid even the appearance of bias by declining to speak privately with any party. Section 2719(b)(1)(A) makes clear that the land acquisition decision is different: it requires consultation with state and local officials. Although the statute could be read to limit consultation with those officials to a specified period of time, after which no contact could take place, such an interpretation would impose arbitrary limits on the submission of relevant information.

Moreover, the due process concerns implicit in preventing the appearance of bias in quasi-judicial agency decisions do not apply with equal force to §§ 2719 and 465 decisions. The American legal system seeks to insulate persons acting in an adjudicative capacity from outside pressures; these decisionmakers are supposed to make decisions based on the law, not on political considerations. They are to disregard facts from sources other than the parties because such information might bring improper outside influences to bear on their reasoning. However, the decisionmaking processes set out by §§ 2719 and 465 do not limit inquiry to facts provided by a limited number of parties. Instead of requiring hearings following specified procedures, these statutes offer broad, basic guidelines for departmental decisionmaking. Sections 2719 and 465 did not deprive plaintiffs of due process simply because other parties were allowed to voice their concerns and to attempt to influence the department's views on plaintiffs' application. The department or its specific decisionmaker does not appear biased when it accepts a broad range of information and viewpoints in proceedings that are not limited by the evidentiary constraints of a formal adjudicative setting. Rather, the department's openness to information evidences its willingness to consider every perspective in order to reach a decision based on all available information.

A determination that the appearance of bias standard does not apply to § 2719 decisionmaking does not mean that all contacts with the agency are permissible; it means only that interaction with the agency is not improper per se. It is still necessary to analyze whether the possibility that legislative and executive contacts with the department so tainted the decision on plaintiffs' application as to warrant extra-record discovery.

### A. Plaintiffs' Showing of Improper Political Pressure

■ In the absence of clear evidence to the contrary, courts should presume that public officers have discharged their official duties properly. *See United States v. Chemical Foundation,* 272 U.S. 1, 14–15, 47 S.Ct. 1, 6, 71 L.Ed. 131 (1926). Without this presumption, agency officials might find themselves in court constantly, burdened with challenges from parties unhappy with the agency's decisions. *See Environmental Defense Fund, Inc. v. Blum,* 458 F.Supp. 650, 663 (D.D.C.1978) ("Political influence in the improper sense of the term is an easy charge to make; the mere making of that accusation though must not serve to allow those disappointed by regulatory activity to ... [conduct] an extensive search into the agency's decisional processes."). Nonetheless, public officials are not immune from scrutiny. When there are adequate grounds to suspect bad faith or improper behavior that are not apparent from the administrative record, depositions of the decisionmakers are appropriate. *Community Federal Sav. & Loan Assn. v. Federal Home Loan Bank,* 96 F.R.D. 619, 621 (D.D.C.1983) (citing *United States v. Morgan,* 313 U.S. 409, 422, 61 S.Ct. 999, 1004–05, 85 L.Ed. 1429 (1941)).

### 1. Inapplicable exceptions to general rule of no discovery

Plaintiffs cite a number of cases in their attempt to show that extra-record discovery is not uncommon. I note first that a number of these cases resulted in denial of such discovery. *See Community for Creative Non–Violence,* 908 F.2d at 998 (deposition of

National Park Service regional director not allowed because no evidence that record was so bare as to frustrate effective judicial review); *Martin v. Valley Nat'l Bank of Arizona*, 140 F.R.D. 291, 314 (S.D.N.Y.1991) (defendants' showing justifies brief deposition of only one of three proposed deponents); *Church of Scientology of Boston v. Internal Revenue Service*, 138 F.R.D. 9, 12 (D.Mass. 1990) (deposition of high-level IRS official not permitted because no showing that information he had was not otherwise available); *Community Federal*, 96 F.R.D. at 621 (because plaintiffs presented no evidence of bad faith and did not contend that administrative record was incomplete, no extra-record discovery allowed).

 Other cases cited by plaintiffs focused on exceptions to the general prohibition on extra-record discovery suggested in *Overton Park*, 401 U.S. at 420, 91 S.Ct. at 825–26, that do not fit this case, although plaintiffs suggest otherwise. Two of the exceptions have no applicability to this case. For example, it is not necessary to have further explanation of agency action in order to review the decision effectively. *Cf. Arkla Exploration Co. v. Texas Oil & Gas Corp.*, 734 F.2d 347, 357 (8th Cir.1984), *cert. denied*, 469 U.S. 1158, 105 S.Ct. 905, 83 L.Ed.2d 920 (1985) (proper for district court to admit supplementary evidence for limited purpose of explaining record so that court can determine adequacy of agency proceedings). In addition, plaintiffs have not shown that the agency relied on documents not included in the administrative record. *See Dopico v. Goldschmidt*, 687 F.2d 644, 654 (2d Cir.1982) (extra-record discovery allowed where strong suggestion that documents fundamental to agency decision were missing from record); *Bethlehem Steel Corp v. United States Environmental Protection Agency*, 638 F.2d 994, 999–1000 (7th Cir.1980) (agency must supplement administrative record with documents it released to plaintiffs and on which it appears to have relied); *Home Box Office, Inc. v. Federal Communications Comm'n*, 567 F.2d 9, 54 (D.C.Cir.), *cert. denied*, 434 U.S. 829, 98 S.Ct. 111, 54 L.Ed.2d 89 (1977) (incomplete record is fictional account of actual decisionmaking process). Although plaintiffs believe that defendants relied on information

and factors not articulated in the record, they are more interested in the oral communications and pressures that may have been exerted on defendants than in any specific documents that defendants might have misplaced. Plaintiffs' best argument for extra-record discovery is based on a third exception, that discovery may be permitted when evidence suggests that bad faith or improprieties may have influenced the decisionmaker. *See Overton Park*, 401 U.S. at 420, 91 S.Ct. at 825–26.

### 2. Bad faith and impropriety exception

In *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 91 S.Ct. 814, the United States Supreme Court instructed courts to allow extra-record examination of agency personnel only upon a "strong showing of bad faith or improper behavior." *Id.* at 420, 91 S.Ct. at 825. In the quarter-century following *Overton Park*, courts have struggled to give further definition to this broad guideline.

Plaintiffs cite several cases seeking to demonstrate that they have made the requisite "strong showing," but these cases do not advance their argument. In *Public Power Council v. Johnson*, 674 F.2d 791, the Court of Appeals for the Ninth Circuit permitted petitioners to take the depositions of two agency officials who had negotiated agency contracts allegedly in violation of the Pacific Northwest Electric Power Planning and Conservation Act, 16 U.S.C. § 839. *Id.* at 792–93. The court recognized that petitioners' showing of bad faith "ordinarily ... might not be sufficient to justify a discovery order," but explained that it was permitting limited discovery for "compelling reasons" in reliance on several other exceptions to the rule that review is to be restricted to the record. *Id.* at 795. The court's brief reference to the bad faith exception does not help to clarify the kind of bad faith showing that would be sufficient to obtain extra-record discovery under *Overton Park*, 401 U.S. at 420, 91 S.Ct. at 825–26. The court glossed over the importance of the necessary showing, stating that it was sufficient for petitioners to show their evidence was not "insubstantial or frivolous." *Public Power Council*, 674 F.2d at

795. This requirement is far weaker than the *Overton Park* "strong showing" test. *See* 401 U.S. at 420, 91 S.Ct. at 825–26. It is unclear whether the Court of Appeals for the Ninth Circuit continues to adhere to this "insubstantial or frivolous" touchstone. *See Havasupai Tribe v. Robertson,* 943 F.2d 32, 34 (9th Cir.1991), *cert. denied,* 503 U.S. 959, 112 S.Ct. 1559, 118 L.Ed.2d 207 (1992) (party whose only evidence of bad faith is pure speculation not entitled to extra-record discovery); *Portland Audubon,* 984 F.2d at 1549 (discussing *Public Power Council* ).

In *Pension Benefit Guaranty Corp. v. LTV Steel Corp.,* 119 F.R.D. 339 (S.D.N.Y. 1988), the court applied the *Public Power Council,* 674 F.2d 791, standards without making any inquiry into the type of showing made by the party seeking discovery. Rather, the court quoted *Public Power Council* for the proposition that although a party must make a strong showing to justify such discovery in most cases, it does not always need to do so. *Id.* at 344. The court did not explain when and why it could dispense with the strong showing requirement but seemed to believe depositions are acceptable if the court retains the power to determine whether the information gathered in those depositions can become part of the record.

Defendants cite *Town of Norfolk,* 968 F.2d at 1458–59 (1st Cir.1992), for the proposition that "[c]ourts require a strong showing of bad faith or improper behavior before ordering the supplementation of the administrative record." Like *Public Power* and *Pension Benefit, Town of Norfolk,* does not provide much insight into the requisite strong showing. The court had an opportunity to review the contested documents in camera before issuing its decision and found, after reviewing them, that there was no evidence of "political pressure" or any unseemly influence and limited review to the administrative record. *Id.* at 1458–59. In the case before the court, the alleged political interference is more elusive. It is far more difficult to determine whether a strong showing has been made when there are no contested documents to review.

Other cases do not provide greater assistance in understanding how compelling a demonstration of bad faith or improper behavior is required by the "strong showing" requirement first set forth in *Overton Park,* 401 U.S. at 420, 91 S.Ct. at 825–26. *See In re Federal Deposit Ins. Corp.,* 58 F.3d 1055, 1062 (5th Cir.1995) (fact that agency heads considered the preferences (even the political ones) of other government officials concerning how to exercise discretion does not establish required degree of bad faith or impropriety); *City of Mount Clemens v. United States Environmental Protection Agency,* 917 F.2d 908, 918 (6th Cir.1990) (when compared to record of EPA's reasoned project evaluations and careful certification procedures, city's unsubstantiated allegation of bad faith does not warrant invocation of the bad faith exception); *Animal Defense Council v. Hodel,* 840 F.2d 1432, 1437–38 (9th Cir.1988) (administrative record reflects defendants' good faith).

If any principle emerges from the cases interpreting the *Overton Park* bad faith exception, it is that a court must scrutinize each matter carefully and individually while holding plaintiffs to their significant evidentiary burden. Applying that principle here, I conclude that plaintiffs have not adduced the evidence necessary to justify opening review of the Department of the Interior's decision to allow consideration of extra-record materials.

### 3. *Plaintiffs' evidence*

Plaintiffs premise their "strong showing" on a series of events following the initial approval of their application by the Minnesota Area Office of the Bureau of Indian Affairs of the Department of the Interior. Although the portrait that plaintiffs paint involves significant political activity, there is surprisingly little evidence of interaction between congressional or presidential officials and Department of the Interior staff, as a recap of the three specific events constituting the actual contact among members of Congress, presidential staff and the department will show.

Senator Wellstone and the Minnesota congressional delegation contacted the department for the first time in a letter dated January 11, 1995. They requested that Sec-

retary Babbitt meet with members of the Indian tribes opposing plaintiffs' application to allow them to voice concerns about the process used and the decision reached by the Minnesota area office. The department granted this request: on February 8, 1995, John Duffy and George Skibine met with the opposition tribes, Senator Wellstone and several of the Minnesota congressmen. The meeting had an important outcome: Duffy agreed to allow the opposition tribes to submit further comments on the proposed project but did not inform plaintiffs of this decision until six weeks later.

The next contact between Senator Wellstone and the Minnesota congressional delegation and the Department of the Interior did not take place for several months. In a letter dated June 12, 1995, Wellstone and the delegation wrote to Harold Ickes, White House Deputy Chief of Staff for Policy and Political Affairs, asking him to convey their concerns about plaintiffs' application to Secretary Babbitt. On June 26, 1995, Jennifer O'Connor in the White House office of Political Affairs faxed the June 12 letter to the Department of the Interior. The June 26 fax can be considered both congressional and presidential contact with the department. Heather Sibbison, an assistant to Secretary Babbitt, faxed back a response the next day, explaining essentially that a decision to deny the project had been made already.

The final evidence of any contact between presidential staff and the department is the alleged non-record statement of Secretary Babbitt on July 14, 1995 that he could not hold up a final decision on plaintiffs' application because Harold Ickes had told him the decision had to go out that day.

Plaintiffs provide evidence of other political activity, including an April 28, 1995 meeting between opposition tribes and the Democratic National Committee chairman and White House staff and a May 8, 1995 letter from the opposition tribes' lobbyist to Harold Ickes setting forth the political ramifications of the decision on plaintiffs' application. The problem with this evidence is that plaintiffs do not link it any way to the Department of the Interior and to the officials reviewing plaintiffs' application. *See Peter Kiewit*

*Sons' Co.*, 714 F.2d at 169–70 (proper focus is not on content of congressional communications in abstract, but on relation between communications and administrative decisionmaker). Plaintiffs suggest that the reason they have not made this link is because they have not had the opportunity to conduct further discovery, but they need more than the slight possibility of a connection between the department and the April 28 meeting or the May 8 letter to secure approval of extra-record discovery.

Marshaling only three instances of congressional and presidential contact with the agency, plaintiffs have not made a sufficient showing of bad faith or improper action on the part of the agency to warrant extra-record discovery. Given the broad decision-making factors laid out in §§ 2719 and 465, the department was wise to seek out as much information as possible before making its decision, including information from congresspeople and presidential staff. Section 2719(b)(1)(A) provides specifically that the department should consult with "appropriate State and local officials." Although the proposed casino was to be built in Wisconsin, the department did not go awry in concluding that congressional and senatorial representatives from an adjoining state were "appropriate" state officials with whom to consult.

It is not surprising that the opposition tribes enlisted the support of Senator Wellstone and the Minnesota congressional delegation. The fact that a meeting took place between these representatives and the department does not raise any concerns in and of itself. If plaintiffs had presented evidence that Wellstone and the congressional delegation had threatened the department with cuts in departmental funding, this case would be more like *District of Columbia Fed'n*, 459 F.2d at 1245–46 (individual congressperson cannot hold agency "hostage" by threatening to condition release of funds on agency's approval of a given project), and plaintiffs might have a stronger argument for extra-record discovery. However, there is no indication that these officials asked the department to consider any factors other than those enumerated in §§ 2719 and 465.

It may be impossible to draw a clear line between congressional involvement and political persuasion because such persuasion is often of a subtle nature and does not need to be voiced to be understood. However, Department of the Interior officials are not political novices. They could weigh the implicit or explicit messages of the Minnesota representatives. *See District of Columbia Fed'n,* 459 F.2d at 1258 (MacKinnon, J., concurring and dissenting in part) (no person with the position and ability to make important agency decision would be ignorant of publicly expressed congressional position on matter).

The Department of the Interior could have made plaintiffs aware of the February 8 meeting at an earlier date. Yet plaintiffs learned of the meeting more than a month before the April 30 deadline. They had time to engage their own congressional representatives to make their viewpoints known to the department.

Plaintiffs point to the June 26 fax from the White House office of Political Affairs to the Secretary of the Interior as further evidence of improper congressional and presidential involvement in agency decisionmaking, but the timing of the secretary's immediate response to this fax the next day suggests that the fax had little influence on the agency's decision. It is unlikely that the secretary would make a unilateral decision to deny the application overnight without undertaking consultation with other department officials. The secretary's swift response implies that the department had made a decision on plaintiffs' application before it received the June 26 fax, thereby undermining any possible implication of pressure.

Plaintiffs contend that the timing of the fax has little to do with the pressure that may have affected the decision. In their view, the June 26 fax is just one of the known pieces of the decisionmaking puzzle that suggests that other pieces could be uncovered with further inquiry. But plaintiffs' pieces do not make a whole. Even considering Secretary Babbitt's alleged statement that presidential staff tied him to a specific date for release of the decision on plaintiffs' application, plaintiffs' showing falls short. Plaintiffs fail to ac-

knowledge that it is just as plausible that Michael Anderson made his decision for the reasons set forth in his July 14 letter. There is no question that considerable disagreement existed within the department whether to grant plaintiffs' application. The Indian Gaming Management staff issued a report recommending approval of the application not once but twice. Anderson disagreed with that recommendation and chose to deny the application, providing several reasons for the denial of the application, including the opposition of the town of Troy and the city of Hudson, the opposition of nearby tribes and fears that the casino would have a negative impact on the scenic riverway. His reasons are not so unreasonable or questionable as to suggest the need for further judicial inquiry.

Having concluded that defendants' motions for a protective order and to limit review to the administrative record should be granted, I proceed to the cross motions for summary judgment filed by the parties with respect to plaintiffs' third and seventh claims for relief. Before doing so, it is necessary to address two related motions briefly.

## II. MOTIONS TO STRIKE

■ Plaintiffs have filed a motion to strike a declaration and four affidavits filed by defendants. Plaintiffs argue that by attempting to supplement the record, defendants are admitting that the record is incomplete and contains evidence of political pressure. Defendants counter that they filed the declaration and affidavits to respond to plaintiffs' charges of political impropriety, an attack they could not have anticipated during the decisionmaking process. I agree with defendants that it does not make sense to require them to include statements in the original administrative record that they followed statutory guidelines and were not influenced by political pressures in the record. Such documents would not serve much purpose and would bloat already sizable administrative records. Because defendants' affidavits do not supplement the substantive basis for denying plaintiffs' application but respond to unanticipated charges of improper behavior, they are properly part of the record before the court.

Defendants have filed a motion to strike from the administrative record the May 8, 1995 letter from Patrick O'Connor to Harold Ickes, White House Deputy Chief of Staff for Policy and Political Affairs. Defendants include an affidavit from George Skibine, who avers that he was in charge of compiling the record and included this letter inadvertently although it was not before the department at the time a decision was made on plaintiffs' application. Skibine explains that the department did not receive the letter until early November 1995 when it was faxed to the department from the United States Attorney's Office in Madison, Wisconsin. He points out that the letter bears the facsimile header of the United States Attorney's Office for the Western District of Wisconsin as well as a date of November 9, 1995. Because it appears clear that the letter was not before the department at the time of Anderson's decision on plaintiffs' application and because plaintiffs have not opposed this motion, I will grant defendants' motion to strike these pages from the administrative record.

III. PLAINTIFFS' SEVENTH CLAIM— MICHAEL ANDERSON'S AUTHORITY TO DENY PLAINTIFF'S APPLICATION

Plaintiffs contend that Michael Anderson, Deputy Assistant Secretary—Indian Affairs, did not have the authority to deny their application under either 25 U.S.C. § 2719(b)(1)(A) or 25 U.S.C. § 465. According to plaintiffs, Secretary Babbitt has delegated his authority under these statutes to Ada Deer, Assistant Secretary–Indian Affairs, and she alone had the capacity to decide the fate of their application. Moreover, plaintiffs argue that although Anderson's July 14 letter stated that his decision was "final for the Department," departmental regulations provide that decisions by a deputy assistant secretary are appealable to the Interior Board of Indian Appeals. Defendants explain that Michael Anderson made the decision on plaintiffs' application because Ada Deer found it necessary to recuse herself. They contend that departmental guidelines allow a deputy assistant secretary to exercise the authority delegated to the Assistant Secretary and that Anderson showed he was acting with the full authority of Assistant Secretary Deer by stating that his decision on plaintiffs' application was final for the department.

In arguing that Ada Deer's recusal was unjustified and therefore ineffective, plaintiffs take a narrow view of the administrative regulations governing recusal. 5 C.F.R. § 2635.502(a) suggests that decisionmaking officials recuse themselves if they have a financial interest in the matter or a "covered relationship" with one of the parties and believe that a reasonable person would question their impartiality. According to plaintiffs, recusal is improper unless certain predicate circumstances exist. It is unnecessary to discuss these circumstances. The reality is that recusal involves difficult decisions about proper ethical conduct and should be encouraged in situations in which an official's participation might be viewed as biased. The intent of the recusal regulations is to promote the integrity and appearance of the administrative decisionmaking system.

To determine why Assistant Secretary Deer recused herself, it is necessary to address plaintiffs' motion asking the court to take judicial notice of several public documents that are part of the records of the State of Wisconsin Elections Board. The records relate to the state senatorial campaign of Gaiashkibos, one of the leaders of the plaintiff tribes, and they show that Ada Deer contributed $250 in December 1994 to help retire Gaiashkibos's debt from his unsuccessful campaign. Defendants have not filed any opposition to plaintiffs' motion to take judicial notice and I will do so for the limited purpose of considering the records in relation to the propriety of Ada Deer's recusal.

It was well within the range of reason for Assistant Secretary Deer to conclude that her previous contributions to Gaiashkibos might be seen as tainting her objectivity. Although it is odd that Deer made her recusal so late in the process, it would be imprudent to fashion a judicial rule that set time limitations on recusal when such limits are neither mentioned in the statute nor likely to

advance efforts to promote the appearance and actuality of system-wide integrity.

■ The next question is whether even if Deer's recusal was proper, Michael Anderson had the authority to make a "final decision" on their application. Decisions made by a Deputy to the Assistant Secretary—Indian Affairs (other than the deputy in charge of Indian Education Programs) are appealable to the Interior Board of Indian Appeals. 25 C.F.R. § 2.4(e). An appealable decision is not considered a final departmental decision subject to judicial review under 5 U.S.C. § 704 unless the official to whom the appeal is made determines that the decision must be made immediately. 25 C.F.R. § 2.6(a). Decisions taken by the Assistant Secretary—Indian Affairs are not appealable unless she provides otherwise in her decision. 25 C.F.R. § 2.6(c). If Michael Anderson was acting in his capacity as Deputy to the Assistant Secretary—Indian Affairs when he denied plaintiffs' application, he lacked the authority to dictate that the decision was "final for the Department." However, if he was exercising the authority of Assistant Secretary Deer in denying the application, it was within his power to designate the decision as final.

Defendants point to Chapter 8 of Departmental Manual 209 § DM 8.3(A) that provides:

In the absence of, or under conditions specified by, the Assistant Secretary—Indian Affairs, a Deputy Assistant Secretary—Indian Affairs may exercise the authority [of the Assistant Secretary].

Defendants do not suggest that Deer was absent but rather assert that Anderson was acting under conditions specified by Deer, as shown by the fact that Anderson stated his decision to be "final for the Department." Plaintiffs counter that nothing in the record shows that Deer specified conditions under which Anderson could act for her on plaintiffs' application and they note that Anderson did not sign the July 14 letter as "Acting Assistant Secretary" but signed it merely as Deputy Assistant Secretary.

However wise it might have been for Assistant Secretary Deer to document her recusal in the administrative record, departmental regulations do not require her to do so. See 5 C.F.R. § 2635.502(e)(2). It is sufficient that she "take whatever steps necessary to ensure that [s]he does not participate in the matter from which [s]he is disqualified." See 5 C.F.R. § 2635.502(e)(1). Too much emphasis should not be placed on Anderson's failure to sign the letter as Acting Assistant Secretary. Doing so might have made this judicial inquiry less complicated but the lack of that title on the decision letter is not sufficient to rebut defendants' assertion that Anderson evidenced his authority by claiming that the decision was final. I must presume that Anderson is aware of the limits of his authority and would know that his decisions as Deputy Assistant Secretary are generally subject to appeal. Anderson was aware of Deer's recusal at the time of issuing the decision and knew that he was making a decision that otherwise would have been hers. I conclude that Anderson was acting as Assistant Secretary and had the authority to make a final decision on plaintiffs' application.

## IV. PLAINTIFF'S THIRD CLAIM—INDIAN GAMING REGULATORY ACT CONSULTATION PROCESS

■ The issue raised in plaintiffs' third claim is whether John Duffy, Counselor to Secretary Babbitt, lacked the authority to "reopen" the consultation period under 25 U.S.C. § 2719(b)(1)(A) and acted unlawfully when he allowed opposition tribes to submit additional comments on plaintiffs' application between February 8 and April 30, 1995. In plaintiffs' view, Assistant Secretary Deer delegated to the Minnesota Area Director the sole responsibility for conducting the § 2719(b)(1)(A) consultations and never authorized Duffy to make such a decision.

Plaintiffs rely on two documents: 1) a letter dated March 24, 1994, from Deer to Myron Ellis of the Minnesota Indian Gaming Association that advised that "[the area office review] is the only opportunity for the tribes to express their views and objections to the proposed trust acquisition"; and 2) an area office guidance dated September 28, 1994. Defendants focus on language in the March

24 letter stating that the Minnesota Area Office "initiated the Section 20 consultation required" by § 2719. This letter is inconclusive. Assistant Secretary Deer's March 24 letter was in response to a letter dated January 10, 1994 from Ellis expressing his organization's opposition to plaintiffs' plans. It is not clear whether Assistant Secretary Deer was explaining to Ellis that he could never submit his views to the Secretary of the Interior or merely stating that at that time Ellis should direct his opinions to the area office. It is unlikely that Assistant Secretary Deer intended to limit the department's authority to accept any objections submitted after the area office review. It is just as plausible that Deer took such a position because she believed it was improper for her or the Secretary of the Interior to be involved in the merits of the decision until the area office had finished its review.

The September 28 area office guidance shows that the Assistant Secretary has delegated significant responsibility to the area offices with respect to conducting the consultations required by § 2719. However, the relevant question is not what powers the Assistant Secretary has granted the area office with respect to § 2719 consultation but whether she has restricted herself or Secretary Babbitt from conducting additional consultation after the area office review is completed. Plaintiffs have not shown that the area office guidance imposes such limits. Accepting plaintiffs' position would mean that these two critical decisionmakers would be barred from accepting any submissions that contained relevant information and would thereby be limited in reaching a decision based on all available information. It would also mean that Deer and Babbitt would be stripped of considerable oversight powers with respect to determinations reached by the area offices.

John Duffy, counselor to Secretary Babbitt, appears to have been unsatisfied with the scope of consultation conducted at the area level. It is not surprising that Duffy had questions about the impact of the decision on the surrounding communities when both the town of Troy and city of Hudson had passed resolutions opposing the project during the period between the area office's submission of its report and the February 8 meeting. Defendants argue that Duffy's authority to allow opposition tribes to submit more information comes from Chapter 1 of Departmental Manual 109, paragraph 1.3(E), stating that counselors "work directly with Assistant Secretaries in expediting and highlighting matters requiring immediate or specific attention. Like the Assistant Secretaries, they issue guidance with the full authority of the Secretary." Although defendants do not make clear how Duffy's actions were "guidance," Duffy's decision to accept further submissions concerned a matter requiring specific attention. Duffy may have had valid concerns that without more time for the submission of information, Assistant Secretary Deer would base a final decision on inaccurate information. Such a concern is a legitimate reason for action. I conclude that Duffy did not overstep departmental authority guidelines in allowing additional submissions.

## ORDER

IT IS ORDERED that the motions of defendants Bruce C. Babbitt, Michael J. Anderson, John J. Duffy and George Skibine for a protective order, to limit judicial review to the administrative record, to strike a portion of the administrative record and for summary judgment on plaintiffs' third and seventh claims are GRANTED. Plaintiffs' motion to take judicial notice of certain State of Wisconsin Elections Board records is GRANTED. Plaintiffs' motions for partial summary judgment on its third and seventh claims and to strike a declaration and several affidavits filed by defendants are DENIED.