**SOKAOGON CHIPPEWA COMMUNITY (MOLE LAKE BAND OF LAKE SUPERIOR CHIPPEWA); Lac Courte Oreilles Band of Lake Superior Chippewa Indians of Wisconsin; and Red Cliff Band of Lake Superior Chippewa Indians of Wisconsin, Plaintiffs,**

v.

**Bruce C. BABBITT, Secretary, United States Department of the Interior; Michael J. Anderson, Deputy Assistant Secretary, United States Department of the Interior; John J. Duffy, Counselor to the Secretary, United States Department of the Interior; and George Skibine, Director, Indian Gaming Management Staff, United States Department of the Interior, Defendants.**

No. 95–C–659–C.

United States District Court, W.D. Wisconsin.

March 19, 1997.

Kevin C. Potter, Brennan, Steil, Basting & MacDougall. S.C., Madison, WI, for Sokaogon Chippewa Community, Mole Lake Band of Lake Superior, Lac Courte Oreilles Band of Lake.

Robert H. Friebert, Friebert Finerty & St. John, S.C., Milwaukee, WI, for Red Cliff Band of Lake Superior.

Mark A. Cameli, Asst. U.S. Atty., Madison, WI, for Bruce C. Babbitt, U.S. Dept of Interior, Michael J. Anderson, John J. Duffy and George Skibine.

## OPINION AND ORDER

CRABB, District Judge.

Plaintiffs are three Chippewa Indian tribes that submitted applications to the United States Department of the Interior in October 1993 pursuant to 25 U.S.C. § 2719 (the Indian Gaming Regulatory Act), requesting that the United States acquire in trust a greyhound racing facility in Hudson, Wisconsin for conversion into an off-reservation casino. After two years of deliberations at the local and national levels, Michael J. Anderson, Deputy Assistant Secretary—Indian Affairs for the Department of the Interior, denied plaintiffs' application in a letter dated July 14, 1995, citing the strong opposition of surrounding communities, elected state officials and neighboring tribes, the detrimental impact of the proposed casino on the profitability of the casino run by the St. Croix Tribe of Wisconsin in Turtle Lake, Wisconsin and the potentially harmful impact of the proposed casino on the nearby St. Croix National Scenic Riverway. Plaintiffs responded by filing this civil action, alleging that improper political pressure from high-level congressional and executive branch officials tainted the decisionmaking process and led to the rejection of their application.

Plaintiffs raise nine claims in their complaint, alleging that defendants violated 25 U.S.C. § 2719 and 25 U.S.C. § 465 (the Indian Reorganization Act of 1934) in a number of ways. In an order entered June 11, 1996, I granted defendants' motion for partial summary judgment on plaintiffs' third and seventh claims and held that judicial review of defendants' decision would be limited to the administrative record. *Sokaogon Chippewa Community v. Babbitt*, 929 F.Supp. 1165 (W.D.Wis.1996). After that order was entered, the parties agreed that the remaining issues in the case could be decided as an appeal from an administrative record on written briefs and supplemental proposed findings of fact. *See* Order of June 17, 1996 (Dkt.# 61).

The case is now before the court on that appeal. In addition, plaintiffs have moved for reconsideration and vacation of the June 11 order and have asked that the court consider evidence extrinsic to the administrative record and take judicial notice of several public documents. Upon reexamination of the June 11 order, I am persuaded that I erred in ruling that judicial review should be limited to the administrative record and that defendants were entitled to a protective order shielding them from extra-record discovery. At the time, it seemed that plaintiffs had not brought forward enough evidence of potential improper political influence on Deputy Assistant Secretary Anderson's decision to warrant extra-record inquiry. After reconsideration, I recognize that it is necessary to accord greater weight to the inferences that can be drawn from the evidence plaintiffs did present. Accordingly, I will grant plaintiffs' motion for reconsideration of the June 11 order with respect to that portion of the order limiting judicial review to the administrative record and granting defendants a protective order. Plaintiffs will be permitted to conduct limited discovery of agency decisionmakers before this court rules on their remaining claims.

Plaintiffs' motion to reconsider the decision in the June 11 order to grant defendants summary judgment on plaintiffs' third and seventh claims will be denied because I find no error in those assessments. Plaintiffs' initial motion to consider evidence extrinsic to the administrative record and to take judicial notice of several documents outside the

administrative record will be granted.[1] Plaintiffs' three supplementary motions to consider evidence extrinsic to the record will be denied. I will stay a decision on plaintiffs' administrative appeal until plaintiffs have had an adequate opportunity to complete discovery and depose the relevant individuals.

For the purpose of deciding plaintiffs' motion for reconsideration, I rely on the undisputed facts as recorded in the June 11 order. *See Sokaogon Chippewa Community*, 929 F.Supp. at 1169–1172. To the extent I have considered evidence outside of those facts in evaluating plaintiffs' motion, the additional evidence will be highlighted in the opinion below.

## OPINION

A. *Motion to Reconsider Decision to Limit Judicial Review to the Administrative Record*

1. *Discussion of political pressure in June 11, 1996 order*

A brief review of the June 11 order, *Sokaogon Chippewa Community*, 929 F.Supp. 1165, is necessary to set the stage for a discussion of plaintiffs' motion to reconsider the decision to limit judicial review to the administrative record. In analyzing plaintiffs' allegations of political impropriety, I began with the presumption that congressional and presidential oversight of agency decisionmaking is beneficial to democracy because it creates a certain level of accountability for non-elected agency officials. *Id.* at 1173. At the same time, however, overzealous involvement by congressional or presidential staff jeopardizes the independence of agency decisionmakers. If these decisionmakers are beholden to specific political interests, democracy suffers to the extent that agency decisions are based on purely political factors rather than on those factors set out by Congress in statutes such as 25 U.S.C.

§§ 465 and 2719. Because distinctions between permissible oversight and impermissible political pressure can be difficult to draw, courts rely on the type of agency proceeding to set ground rules for permissible contact. *Id.* at 1174. In quasi-adjudicative proceedings, even an appearance of bias is considered damaging to the integrity of the adjudicative process and contacts between agency decisionmakers and congressional or presidential officials are strictly taboo. In quasi-legislative proceedings, the standard is less stringent because some contact is necessary to allow the agency to gather the factual information necessary to make a fully informed decision.

The Department of the Interior's decisionmaking authority under §§ 465 and 2719 does not fit neatly into either the quasi-adjudicative or quasi-legislative categories. *Sokaogon Chippewa Community*, 929 F.Supp. at 1175. Nonetheless, a strict "appearance of bias" standard does not seem applicable to § 2719 decisions, which require the Department of the Interior to consider a wide range of information. Thus, interaction between the department and congressional and presidential officials concerning an application such as plaintiffs' is not improper per se. But that does not mean that it is permissible for White House staff to dictate the outcome of a decision that is delegated by Congress to the Department of the Interior. Courts must inquire whether improper legislative or executive contacts have tainted agency decisions impermissibly.

Generally, courts limit their reviews of agency decisions to the administrative record. However, where a party can make a "strong showing of bad faith or improper behavior," it may be entitled to extra-record discovery and examination of agency personnel. *Sokaogon Chippewa Community*, 929 F.Supp. at 1177 (citing *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 420, 91

---

1. Plaintiffs ask the court to take judicial notice of 1) excerpts from Senate Report (Indian Affairs Committee) No. 100–446 (1988), 2) a letter dated August 18, 1994 from Secretary of the Department of the Interior Bruce Babbitt to John Engler, Governor of the state of Michigan, concerning the application of the Sault St. Marie Tribe of Chippewa Indians to place 0.7 acres of land in Detroit in trust for the benefit of the tribe, and 3) the United States Department of the Interior's petition for a writ of certiorari in *South Dakota v. United States Department of the Interior*, 69 F.3d 878 (8th Cir.1995). (Dkt.# 62). Defendants have not filed any opposition to plaintiffs' motion. Accordingly, I will grant the motion.

S.Ct. 814, 825–26, 28 L.Ed.2d 136 (1971)). The case law applying the *Overton Park* "strong showing" standard does not make clear exactly what evidence suffices to constitute a "strong showing." All that can be divined from the cases interpreting *Overton Park* is the principle that a court must scrutinize each matter carefully and individually while holding plaintiff to a significant evidentiary burden. *Id.* at 1178. Analyzing this case in such fashion, I concluded that plaintiffs had not met their evidentiary burden and granted defendants' motion for a protective order and to limit judicial review of Deputy Assistant Secretary Anderson's decision to the administrative record.

2. *Analysis of "strong showing" requirement as articulated in June 11, 1996 order*

█ The court's discussion of the permissible bounds of congressional and presidential involvement in agency decisionmaking in the June 11 order was sound, *Sokaogon Chippewa Community*, 929 F.Supp. at 1172–1178, but did not give full consideration to the inferences to be drawn from the evidence presented by plaintiffs. The factual inferences that were drawn in defendants' favor can be drawn in plaintiffs' favor also. When that is done, there is sufficient reason to suspect that improper political influence affected plaintiffs' application so as to allow plaintiffs an opportunity to further uncover evidence of that influence. Courts should weigh the limited means plaintiffs have at this stage of the proceedings to uncover political impropriety in determining whether they have made a "strong showing" of improper influence.

Courts grant agency decisionmakers substantial deference both on the decisions they make and the process they use to reach their decisions. This deference frees agency officials to act without the burden of having to defend their decisions later in a court of law. But deference does not mean complete absence of scrutiny. In cases in which congressional or presidential officials have made their views on an administrative decision known to the agency, courts play an important role in guaranteeing that the fine line

between permissible and impermissible contact remains firm. If there are adequate grounds to suspect that an agency decision was tainted by improper political pressure, courts have a responsibility to bring out the truth of the matter. *Sokaogon Chippewa Community*, 929 F.Supp. at 1176 (citations omitted).

The presumption of regularity in agency decisionmaking, *see Sokaogon Chippewa Community*, 929 F.Supp. at 1176 (citing *United States v. Chemical Foundation*, 272 U.S. 1, 47 S.Ct. 1, 71 L.Ed. 131 (1926)), serves an important gatekeeping function. Because accusations of improper political influence are easy to make, courts have to be careful in determining just which of those accusations are substantial enough to merit further consideration and extra-record discovery. *Id.* (citing *Environmental Defense Fund, Inc. v. Blum*, 458 F.Supp. 650 (D.D.C. 1978)). If courts are too lenient, agency officials might spend much of their time defending themselves in court against allegations brought by parties disappointed with an agency's decision. However, if a court is never willing to scrutinize agency action, the gates become a cement wall, impervious even to legitimate claims of improper influence.

I am convinced now that plaintiffs' claim deserves to cross the threshold and that this decision will not throw open the court's gates to a vast array of political impropriety claims. Plaintiffs have adduced evidence that few litigants making similar claims will be likely to possess. I recognize that allowing depositions and extra-record discovery will impose a burden on the agency officials involved in this matter. But to the extent that floodgate and burden concerns are present here, they are outweighed by the court's responsibility to reach a just resolution of the dispute, a resolution that can be achieved only if the court has all relevant evidence before it.

█ In the June 11 order, I ruled that plaintiffs had not made a "strong showing" of political impropriety, in large part because plaintiffs had not provided a direct link between congressional or presidential officials and Department of the Interior staff. I held that plaintiffs had established only three con-

tacts among members of Congress, presidential staff and the department and that those three events were insufficient to warrant extra-record discovery. *Sokaogon Chippewa Community*, 929 F.Supp. at 1178–80. I recognized that other political activity concerning plaintiffs' application had taken place, but gave little weight to that evidence because it was not linked to the Department of the Interior officials reviewing the application. Specifically, I stated:

> Plaintiffs suggest that the reason they have not made this link is because they have not had the opportunity to conduct further discovery, but they need more than the slight possibility of a connection between the department and [the other evidence] to secure approval of extra-record discovery.

*Id.* at 1179. Although a court can require plaintiffs to present significant evidence of wrongdoing before allowing them to conduct extra-record discovery, it cannot require them to come forward with conclusive evidence of political improprieties at a point when they are seeking to discover the extent of those improprieties. This is especially true given that agency officials are not likely to keep a written record of improper political contacts; the only way to uncover such contacts is by examining relevant phone records and by asking these officials about their discussions with congressional or presidential officials. Short of providing direct evidence, plaintiffs need to supply sufficient evidence of improper political influence on agency decisionmaking as to raise suspicions that defy easy explanations.

■ I dismissed plaintiffs' attempt to raise such suspicions in the June 11 order by accepting defendants' explanations of what the evidence showed. However, defendants' take on the evidence is not the only reasonable one. Although defendants are entitled to a general presumption of regularity in their decisionmaking, this does not mean that courts must refrain from drawing inferences that tend to indicate otherwise. Agency officials should not be able to overcome a party's showing of political impropriety by simply denying all allegations of wrongdoing. *Latecoere Int'l v. United States Dep't of the*

*Navy,* 19 F.3d 1342, 1365 (11th Cir.1994) (government cannot "wipe away" allegations of bias merely by denying those allegations). In evaluating whether a party has made the requisite "strong showing," a court should not overlook plausible, competing inferences that might be drawn from the evidence presented. Plaintiffs ask the court to see conspiracy in evidence that might be viewed as benign. Although I am reluctant to accept conspiracy theories of government, it would be naive to think that abuses of power never take place or that government agencies never accede to strong political pressure. Drawing all reasonable inferences from the undisputed facts in plaintiffs' favor, I believe there is a distinct possibility that improper political influence affected Anderson's decision on plaintiffs' application. A number of questions remain unanswered in this case, questions not raised in the average agency proceeding. By themselves, these questions may not arouse much suspicion; in combination they make the "strong showing" necessary for extra-record discovery.

### 3. *Reanalysis of plaintiffs' evidence of improper political pressure*

■ The first contact between congressional staff and the Department of the Interior took place in a letter dated January 11, 1995 from Senator Paul Wellstone and the Minnesota congressional delegation to Secretary of the Interior Bruce Babbitt in which the representatives requested that Babbitt meet with the tribes opposed to plaintiffs' application. On February 8, 1995, John Duffy, Counselor to the Secretary, and George Skibine, Director, Indian Gaming Management Staff, met with these tribes, Senator Wellstone and several of the Minnesota congressional representatives. Duffy agreed to allow the tribes to submit further comments on plaintiffs' application. Plaintiffs were not notified of this meeting until six weeks later.

In and of itself, this meeting was not improper. Duffy did not violate 25 U.S.C. § 2719 by allowing the opposition tribes to submit further information on plaintiffs' application, *see Sokaogon Chippewa Community,* 929 F.Supp. at 1182–83 (granting defendants summary judgment on plaintiffs' claim

that Duffy violated § 2719 by allowing opposition tribes to submit additional comments on plaintiffs' application), but the fact that the department did not notify plaintiffs of this meeting and decision until six weeks later raises questions about the department's openness. Plaintiffs did have another month after learning of this meeting in which to submit additional information of their own. However, the department's six-week delay in contacting plaintiffs heightens suspicion that the department had specific reasons for not contacting plaintiffs earlier, especially considering its duty to consult with plaintiffs under 25 U.S.C. § 2719(b)(1)(A). (I do not reach plaintiffs' claim that defendants violated their duty to consult with plaintiffs). The delay may have been inadvertent, but if there were non-political problems with plaintiffs' application, the delay suggests that the department did not contact plaintiffs because it was not interested in allowing plaintiffs to remedy the problems. Alternatively, if there were political problems with plaintiffs' application, the delay suggests that the department had made up its mind already on the basis of the political factors, which no arguments provided by plaintiff could have overcome.

Several months later, on April 28, 1995, the opposition tribes met with Donald Fowler, the Democratic National Committee chairman, White House staff and staff from the offices of Senators John Kerry, Tom Daschle and Paul Wellstone. Although plaintiffs did not present any evidence originally that Fowler or any of the other officials attending the meeting contacted the Department of the Interior, I cannot assume that these tribes met with Fowler merely to socialize. They must have expected that Fowler had some ability to affect the decision on plaintiffs' application. In fact, plaintiffs have submitted extrinsic evidence that shows that Fowler has admitted to talking to someone at the Department of the Interior, as well as Harold Ickes, White House Deputy Chief of Staff for Policy and Political Affairs, about this matter. *See infra* Part A.4.

In a letter dated May 8, 1995, to Harold Ickes, Patrick O'Connor, a lobbyist for the opposition tribes, urged Ickes to deny plaintiffs' application. In doing so, he explained the political significance of the decision, namely that the opposition tribes were important contributors to the Democratic party and that plaintiffs were Republican supporters. I dismissed the importance of this letter in the June 11 order because plaintiffs had failed to present any evidence that Ickes conveyed these political aspects of the decision to the Department of the Interior. However, requiring such proof asked too much of plaintiffs at too early a stage. Plaintiffs did not have the ability to probe department officials to establish this link. The mere fact that the political ramifications of an agency decision were being discussed with an important White House official provides some basis for plaintiffs' desire to know whether this information was ever conveyed to the department. It is not an unimaginable leap to think that the department may have been informed of the political consequences of their decision. If officials in the Department of the Interior were made aware of these factors, that does not necessarily indicate improper political pressure. As I made clear in the last opinion, department officials are free to weigh the implicit or explicit messages of executive or congressional officials. *Sokaogon Chippewa Community,* 929 F.Supp. at 1180. However, if the officials were directed specifically not to approve plaintiffs' application because of these political factors, the department's decision would have to be vacated.

O'Connor's May 8 letter to Ickes not only specifies the political ramifications of plaintiffs' application but mentions that O'Connor had been advised that Fowler had discussed this issue with Ickes. (Although I did not include mention of Fowler's discussion with Ickes in the undisputed facts section of the June 11 order, I omitted it only because I did not believe it relevant at the time. The exact quote from O'Connor's May 8 letter reads, "I have been advised that Chairman Fowler has talked to you about this matter and sent you a memo outlining the basis for the opposition to creating another gaming casino in this area.") Thus, even without plaintiffs extrinsic evidence, there was reason to believe that Fowler had contacted Ickes. As will be explained later, plaintiffs extrinsic evidence shows that this contact did take place.

I note at this point that there are hearsay problems with some of the evidence that plaintiffs use to make their "strong showing." However, it would be unfair to bar plaintiffs from using certain evidence at this stage of the proceedings because of hearsay problems. The premise underlying the hearsay rules, Fed.R.Evid. 801–806, is that evidence is more credible when it comes from the declarants themselves, but unlike most litigants, plaintiffs do not have access to the declarants and thus cannot introduce the more direct testimony at this time. Moreover, the hearsay rules and other admissibility requirements are designed to apply to the fact finding process. In situations such as this, where the question is not the merits of the parties' dispute but whether plaintiffs have made a strong showing that certain improprieties may exist, strict compliance with evidentiary admissibility rules is misplaced. After plaintiffs have had an opportunity to depose the declarants and seek to introduce their statements as fact, they will have to satisfy the hearsay rules.

What seems to be missing from the picture of political compulsion is direct involvement or contact by Ickes or other White House staff with the Department of the Interior and Deputy Assistant Secretary Anderson. But that involvement is not wholly absent. On June 26, 1995, Jennifer O'Connor of the White House Office of Political Affairs faxed a letter to Heather Sibbison in the Office of the Secretary of the Interior inquiring about plaintiffs' application. Sibbison faxed back two letters the next day, one indicating the department had decided to deny the application, the other indicating that the department was reviewing the matter with "great care."

In the June 11 order, I explained that Sibbison's swift response implied that the department had made a decision before receiving the June 26 fax and thereby undermined any implication of pressure from that fax. *Sokaogon Chippewa Community,* 929 F.Supp. at 1180. Although Sibbison's swift response tends to indicate that a decision had been reached before the June 26, 1995 fax was sent, the fact that she sent two letters to the White House with different messages implies that the White House had been in-volved in the matter already. Also, the mere fact that Sibbison sent two somewhat contradictory letters suggests that the department was aware of the need for some subterfuge in the process to allow Ickes to advance political ends. The letters seem almost to allow Ickes to chose which direction he wanted the department to take.

The more troubling implication of Sibbison's June 27 response is that it means the department had reached a decision on plaintiffs' application by that date. This undermines the department's assertion that Deputy Assistant Secretary Anderson was the one making the decision on plaintiffs' application, especially considering that on or before June 29, 1995, George Skibine had prepared a decision letter for Ada Deer, Assistant Secretary—Indian Affairs, in which the department advised that it had denied plaintiffs' application. Deer has explained that she recused herself from the matter because of contributions she had made to one of plaintiffs' leaders, Gaiashkibos. *See Sokaogon Chippewa Community,* 929 F.Supp. at 1181. I remarked in the June 11 opinion that Deer's late recusal was "odd," but refrained from questioning her motives. I find now that it is necessary to consider the flip side of the "odd" recusal: that Deer may have wanted to back out once she understood that higher level officials in the department wanted plaintiffs' application rejected for political purposes. It is reasonable to infer that Deer backed out because she supported plaintiffs' application and did not want to be responsible for denying it. If that were not the case, one might surmise that Deer would have recused herself from the process earlier. The combination of Sibbison's knowledge on June 27, 1995 that the application would likely be denied and the fact that a letter dated two days after that was prepared for Deer's signature makes it difficult to believe that Anderson made the decision himself. (This does not affect the determination that Anderson had the authority to deny plaintiffs' application. *See Sokaogon Chippewa Community,* 929 F.Supp. at 1181–82.)

On July 14, 1995, Paul Eckstein met with Secretary Babbitt on behalf of plaintiffs. Eckstein asserts that Babbitt told him that

Ickes required Babbitt to release the decision on plaintiffs' application that day. In the June 11 order, I noted that it was "just as plausible" that Deputy Assistant Secretary Anderson made the decision to deny plaintiffs' application for the reasons set forth in his July 14 decision letter as it was to assume that Ickes controlled the entire decisionmaking process. *Sokaogon Chippewa Community*, 929 F.Supp. at 1180. But I must give fair weight to the competing inference. The Secretary of the Interior's direct statement concerning pressure asserted on him by the White House, even if the pressure was directed to the specific release date of the decision, is reason to suspect political foul play. Although Babbitt now denies that Ickes required him to do anything, agency officials cannot stymie a party's attempt to make a strong showing of bad faith merely by denying all allegations of bias. *Latecoere Int'l*, 19 F.3d at 1365. It would be improper to dismiss Eckstein's assertion just because Babbitt denies it.

There is also reason to question the complete turnabout between the Indian Gaming Management Staffs release of a draft report on June 8, 1995, recommending the approval of plaintiffs' application and the department's apparently final decision by June 27, 1995 to deny plaintiffs' application. What happened during this twenty-day stretch? Secretary Anderson set forth the reasons for denying plaintiffs' application in the July 14, 1995 letter. the strong opposition of surrounding communities, elected state officials and neighboring tribes; the detrimental impact of the proposed casino on the profitability of the casino run by the St. Croix Tribe of Wisconsin in Turtle Lake, Wisconsin; and the potentially harmful impact of the proposed casino on the nearby St. Croix National Scenic Riverway. Taken at face value, those reasons seem entirely reasonable. Nonetheless, Anderson's reasons and his brief explanations become suspect as pretext when compared with the much lengthier, in-depth reports prepared by the Minneapolis Area Office and the Indian Gaming Management Staff that reached the opposite conclusion. (Again, I did not include the length of the area office and staff reports in the undisputed facts section of the June 11 order because I did not believe that information relevant to the decision. I note that the area office report spanned 32 pages. The Indian Gaming Management Staff's first report in early February 1995 was 26 pages and the second one, dated June 8, 1995, was 17 pages.) Plaintiffs point out also that in making a decision on a similar trust application filed by the Sault Ste. Marie Indians, the department issued a 29–page decision, considerably longer than the three-page decision in this case. Although the adequacy of decisions cannot be assessed with a ruler, the brevity and lack of detailed factual findings in Anderson's July 14 opinion are suspicious. Without deciding whether Anderson's decision was arbitrary and capricious, I note that a complete rejection of the Indian Gaming Management Staffs conclusions without any further factual inquiry is a reason to suggest the necessity of further inquiry.

Anderson's reasons are even more suspicious when compared to the department's May 22, 1996 memorandum and decision on an application by the Mashantucket Pequot Indian Tribe of Connecticut to take land into trust pursuant to 25 U.S.C. § 465. (Dkt.# 55). Although I stated in the June 11 order that this decision had no effect on this case, *Sokaogon Chippewa Community*, 929 F.Supp. at 1169, I now believe that the Mashantucket Pequot decision is relevant to plaintiffs' attempt to show political impropriety. In that case, the department approved the tribe's application even though there was strong local opposition because the tribe had made a good faith effort to address those concerns. Thus, local opposition is not always fatal to an application like plaintiffs'. Although there may be relevant distinctions between the two situations, the department's willingness in May 1996 to approve an application that evoked strong local opposition when it found such local opposition fatal to plaintiffs' application in July 1995 is disconcerting.

### 4. *Plaintiffs' motions to consider extrinsic evidence*

On August 23, 1996 and September 3, 1996, plaintiffs filed motions asking the court to admit evidence extrinsic to the administra-

tive record. In plaintiffs' first motion, they ask the court to consider evidence consisting of a number of newspaper articles and a press release related to plaintiffs' application. (Dkt.# 71). In their second motion, plaintiffs request that the court assess a videotape of an ABC World News Tonight segment dated August 28, 1996 that features a story concerning plaintiffs' application. (Dkt.# 78). Defendants object to these motions, contending that such evidence does not advance plaintiffs' case in any material way. Although I would grant plaintiffs' motion to reconsider without considering the extrinsic evidence plaintiffs ask the court to admit, this evidence contributes further to the conclusion that ultimate fairness in this case is served by allowing plaintiffs to conduct extra-record discovery. More recently, plaintiffs have filed three supplemental motions concerning extrinsic evidence (Dkt.# # 88, 93, 94). Because there is sufficient reason to grant plaintiffs' motion to reconsider without analyzing the arguments raised in those motions, the motions will be denied.

I would be hesitant to allow plaintiffs to rely merely on newspaper articles or television programs to make a showing of potential political impropriety. *See Sierra Club v. Costle*, 657 F.2d 298, 409 n. 539 (D.C.Cir. 1981) (single newspaper article of strong hints of extraneous political pressure not significant enough to warrant finding of unlawful congressional interference). As discussed above, the documents raise significant hearsay problems. But given the other evidence with which plaintiffs have come forth, these submissions cannot be dismissed as fanciful journalistic speculation. I will consider them for the limited purpose of deciding whether plaintiffs have met their evidentiary burden to justify extra-record discovery. This is a very different burden from the ultimate burden plaintiffs have on proving political interference. Although the newspaper articles would not be admissible for the purpose of proving plaintiffs' claim, they are important elements on which it is proper to rely in considering whether plaintiffs have come forward with sufficient evidence to justify extra-record discovery.

The first newspaper article comes from the July 12, 1996 *Wall Street Journal.* The article does not add much new information to the mix. It reports that the tribes opposing plaintiffs' application have made significant contributions to the Democratic National Committee and suggests that those contributions explain Donald Fowler's interest in meeting with those tribes. This information is much the same as that contained in the May 8 letter from Patrick O'Connor to Harold Ickes explaining that plaintiffs were Republicans and the opposition tribes were Democrats. The article cements further the political dynamics of plaintiffs' application.

The second article was published in the July 13, 1996 Minneapolis *Star Tribune.* The article adds a new element to the link between Donald Fowler and the Department of the Interior, reporting that Fowler admits to telephoning both Ickes and "someone in the Interior Department." Fowler may not be a member of the Clinton executive staff, but there is little question that as head of the Democratic National Committee he seeks to promote Democratic political interests. If the Department of the Interior were pressured into this decision by Fowler, it would be nearly as egregious as if it had been pressured into the decision by Ickes, a member of the more immediate White House staff.

The press release submitted by plaintiffs was issued by Senator John McCain, Chairman of the United States Senate Committee on Indian Affairs, on July 19, 1996, announcing that he had sent President Clinton a letter expressing his concern over the issues raised in the July 12 *Wall Street Journal* article. The press release does not contribute to plaintiffs' showing. I imagine it is comforting to plaintiffs to know that a senator is concerned that plaintiffs have been treated unfairly, but such concern does not provide any additional evidence of improper contacts.

Plaintiffs have submitted a videotape of a segment from ABC World News Tonight, dated August 28, 1996. During the program, O'Connor and Ickes are questioned about plaintiffs' application and do not respond. Plaintiffs assert that these non-responses are

adoptive admissions under Fed.R.Evid. 801(d)(2)(B). Plaintiffs contend also that the affidavits and declarations filed by Michael Anderson, George Skibine, Ada Deer and Heather Sibbison and admitted by the court *Sokaogon Chippewa Community,* 929 F.Supp. at 1180, are adoptive admissions. Whether these constitute adoptive admissions or not, plaintiffs will have the opportunity to question these individuals and determine whether they are indeed denying all plaintiffs' allegations.

Defendants' opposition to the admissibility of plaintiffs' extra-record submissions is tempered by the fact that in response to plaintiffs' motion for reconsideration, they have filed several of their own documents extrinsic to the administrative record, including a letter dated August 30, 1996, from Secretary Babbitt to Senator John McCain, an August 29, 1996, memorandum from Heather Sibbison to Secretary Babbitt and an August 29, 1996, memorandum from the office of the solicitors to Secretary Babbitt. Plaintiffs assert that the Sibbison memo contains critical new information supporting their allegations of political impropriety. In the memorandum, Sibbison admits that she and Tom Collier, Chief of Staff of the Department of the Interior, met with Patrick O'Connor in early spring of 1995 to discuss plaintiffs' application. According to Sibbison, O'Connor sought only to ensure that a report from the opposition tribes' financial consultants would be included in the decisionmaking record. In addition, Sibbison explains that the individuals involved in the decision were herself, Anderson, Duffy and Collier. Collier may have had very little to do with the decision. Yet it is surprising that his involvement is surfacing only at this point. It is reasonable to infer that political pressure may have been exerted against Collier and that is why he has not been included in the picture until now. Plaintiffs will be able to determine this through discovery.

In sum, I do not intend to imply that all contacts between agency officials and White House staff are improper. Such meetings are a necessary outgrowth of the manner in which the executive branch is organized. However, where as here, there is considerable evidence that suggests that improper political pressure may have influenced agency decisionmaking, it is necessary to allow extra-record discovery to uncover whether that is true. Many of the events of which plaintiffs complain could be considered innocent in and of themselves. But their combination in this case raises substantial suspicion. It will be the rare case in which a party will be able to present evidence similar to the evidence plaintiffs have produced here suggesting that: agency officials met with opposition groups and did not notify the applicant until six weeks later, the head of the Democratic National Committee met opposition groups and shortly thereafter contacted the White House chief of staff and the agency about the application; a lobbyist laid out the explicit political ramifications of an agency decision to the White House chief of staff; the agency faxed two letters to the White House chief of staff for his signature, allowing him to determine whether to announce the department's decision or to keep it secret until a later date; the regular decisionmaker recused herself after the decision on the application was made; upper-level agency officials rejected the conclusions of the area office and agency staff without conducting further factual inquiries of their own; agency officials relied on a reason for denying the application (local opposition) that is considered insignificant with respect to a later, similar application; and the head of the agency said that he was directed explicitly by the White House chief of staff to issue the agency decision on a given date.

Plaintiffs should note that in order to succeed on their claim of improper political influence, they will need to show that the pressure was intended to and did cause the Department of the Interior's actions to be influenced by factors not relevant under the controlling statutes. *See Town of Orangetown v. Ruckelshaus,* 740 F.2d 185, 188 (2d Cir.1984) (citations omitted). Thus far, plaintiffs have not been able to specify exactly what was communicated between Fowler or Ickes and Department of the Interior officials, but that is primarily because they have not had the opportunity to ask these individuals about the contacts.

B. *Plaintiffs' Motion to Reconsider the June 11 Order With Respect to Their Third and Seventh Claims*

■ Plaintiffs have moved for reconsideration of the decision to grant summary judgment to defendants on plaintiffs' seventh claim, that Michael Anderson lacked the authority to deny their application. According to plaintiffs, new evidence that they have uncovered concerning Anderson's relationship to the opposition tribes reveals that Anderson should have recused himself from the decisionmaking process. Plaintiffs suggest that Anderson was the Executive Director of the National Congress of American Indians in 1992 at the same time that Gaiashkibos was president of that group. Plaintiffs argue that if assistant secretary Deer recused herself because of her $250 campaign donation to Gaiashkibos, Anderson should have done the same because of his past links to Gaiashkibos.

The facts presented do not show that Anderson's relationship to Gaiashkibos imposed any binding responsibility on Anderson to recuse himself. *See* 5 C.F.R. § 2635.502(a) (decisionmaker should not involve himself in matter in which he knows a person with whom he has "covered relationship."). It does not appear that Anderson had a "covered relationship" with Gaiashkibos at the time of the decision. The recusal decision was up to Anderson and he chose to participate.

■ Plaintiffs argue that the court should vacate its June 11, 1996 decision granting defendants summary judgment on plaintiffs' third and seventh claims because the department has admitted that it must base its decisions under 25 U.S.C. § 465 on the specific factors contained in 25 C.F.R. § 151.10. *See* Department of the Interior's Petition for a Writ of Certiorari in *United States Dept of the Interior v. South Dakota, cert. granted,* 65 U.S.L.W. 3291 (Oct. 15, 1996). In the department's petition, it states:

> The Department initially took the view that [§ 465 land acquisition decisions] are unreviewable because they are 'committed to agency discretion by law.' ... The Department has since concluded, however, that although Section 5 confers discretion,

the exercise of that discretion is not entirely unreviewable. The Department of the Interior has accordingly determined (and the Department of Justice agrees) that a decision to acquire land in trust under Section 5 of the IRA is subject to judicial review under the APA, *see* 5 U.S.C. § 706(2), taking into account the factors identified in the Secretary's regulations as relevant in making such decisions.

The Department's change in approach does not affect the decisions on plaintiffs' third or seventh claims. I have explained already that Michael Anderson had the authority to make a decision on plaintiffs' application. Any change in the factors on which Anderson had to rely would not affect his decisionmaking authority. The department's shift has no effect on the grant of summary judgment on plaintiffs' claim concerning John Duffy's authority to "reopen" the consultation period under § 2719. Duffy was concerned that the department did not have sufficient information and believed these tribes could provide that information. The information gathered from these tribes could have been relevant to an analysis of the 25 C.F.R. § 151.10 factors.

### ORDER

IT IS ORDERED that plaintiffs' motion for reconsideration of the opinion and order entered herein on June 11, 1996 (dkt.# 72) is GRANTED with respect to that part of the decision granting defendants a protective order and limiting judicial review to the administrative record. The motion for reconsideration is DENIED in all other aspects. Plaintiffs first two motions to consider extrinsic evidence (dkt.# # 71, 78) and its motion requesting that the court take judicial notice (dkt.# 62) are GRANTED. Plaintiffs supplemental motions to consider extrinsic evidence (dkt.# # 88, 93, 94) are DENIED as moot. Plaintiffs' appeal of defendant Michael J. Anderson's decision of July 14, 1995 is STAYED until plaintiffs have had adequate opportunity to conduct discovery on their allegations of political impropriety. A hearing before United States Magistrate Judge Stephen L Crocker will be held no later than April 11, 1997 to determine the scope of discovery to be undertaken in this

case and to discuss scheduling matters. The clerk of court is instructed to contact the parties to arrange a time for the hearing.